## Case No. 2,331.

CAMBLOS v. PHILADELPHIA & R. R. CO.

DINSMORE v. SAME.

[30 Leg. Int. 149;[1] 4 Brewst. 563; 9 Phila. 411.]

Circuit Court, E. D. Pennsylvania. April 25, 1873.

RAILROADS—CHARGES FOR CARRIAGE — POWERS — COMPETITION—MONOPOLY—EXPRESS COMPANY—PREFERENTIAL ACCOMMODATION—INFRACTION OF CHARTER—SUIT BY STOCKHOLDER — MANDATORY INJUNCTION—WHEN GRANTED INTERLOCUTORILY—CITIZENSHIP OF JOINT-STOCK COMPANY.

1. Of two bills in equity, filed at the same time, one was at the suit of an express carrier against a railroad company to prevent the continuance by them of a competing business in which they were engaged, as he alleged, without authority in their charter; also to compel the allowance by them of certain disputed facilities and accommodations which he claimed in his own business upon their line, and also to prevent the continuance by them of certain alleged overcharges for transporting his express freights. The other bill was against the same company at the suit of one of their stockholders. It contained the same allegations and prayed like relief. He was a party in the interest of the express carrier, and, pending the disputes, had bought the stock in order to promote that interest by thus bringing suit. A preliminary injunction asked under each bill was refused under both, because if either complainant had an equitable right it was not, in such a case, enforceable until final hearing.

[See Cole Silver Min. Co. v. Virginia, etc., Water Co., Case No. 2,990.]

2. A mandatory order, as a method of enforcing the concession of a right, is generally inconsistent with the object and appropriate functions of a preliminary injunction; and unless there is an extraordinary special exigency, will not be made interlocutorily.

3. Under a bill against a corporation by a stockholder, a preliminary injunction is not ordinarily grantable where the question is not that of preventing forfeiture of the charter from being incurred, but only that of alleged erroneous administration of corporate faculties.

4. Here, if the defendants had infringed their charter, the mischief was already done, and preliminary injunction could not avert a forfeiture. The value of their stock in other respects could not be impaired by their participation in the profits of a competing business. Their liability to an action at the suit of the express carrier was a risk which the stockholders had voluntarily sought. Therefore, if he were a complainant for his own interest, he could not ask preliminary injunction.

5. If any act of the defendants prejudicial to the express carrier was also an infraction of their charter, he was not, on the latter account, entitled to any redress. As to him, the only questions were those of alleged injury to his business of a freighter; and those questions, unless there had been a judgment at law, were not of such urgency as necessarily to require interlocutory decision.

6. The charter of a railroad company authorized them to charge certain limited rates of toll to others for passage over the rails; but did not limit their charge for transportation by themselves. The absence of a limitation of the latter charge did not enable them, as common carriers, to make unreasonable charges.

7. A statutory limitation of a railroad company's charges impliedly excludes, within the

[1] [Reprinted from 30 Leg. Int. 149, by permission.]

limit, and question of their unreasonableness, unless rebates from the maximum, or additions to, or rebates from any lower established rates, are systematically unequal. Here equality is understood in a relative sense, as importing that, under like circumstances, a like rate, according to weight or bulk, is charged to all persons for the carriage of goods which are of like descriptions for purposes of transportation. Occasional inequality, even though preferential, is not always necessarily unreasonable. But systematic relative inequality cannot be reasonable.

8. The absolute monopoly of such a company, as owner of the road, includes only the profit from tolls properly so called.

9. Any further monopoly is founded only in the great relative necessity that, for the security of persons and property, a railroad company should have exclusive control of the motive power and of the track.

10. The monopoly of the company, as a common carrier, depends wholly upon the relative necessity, and cannot be extended beyond its exigency.

11. But the company may, as a common carrier, exercise any accessorial functions profitable to themselves and useful to the public.

12. Freight which is transportable partly upon their own road, and partly beyond it, can be received by them as consigned for their ulterior destination.

13. They may, as common carriers, engage in the accessorial business, with horse power, of collecting freight which is to be transported upon their own railroad, and delivering freight at the places of destination.

14. But they cannot monopolize wholly or partly this accessorial business, or promote the monopoly of it by any one else, or appropriate preferential advantages for conducting it, to their own profit, or to that of any one else.

15. Express carriers are not, through any present magnitude, or prospective expansion, of their business, entitled to any such preferential facilities or accommodations from a railroad company as would preclude or impede participation by the railroad company or by any of the public in conducting such business with equal advantage on any scale great or small.

16. The charges by a railroad company for such accessorial service with horse power cannot be imposed upon any of the public who decline to use it.

17. There is no difference between such a direct overcharge and an indirect one made by refusing abatement from a single aggregate charge which includes it.

18. Quaere, whether a rebate of less than the whole amount or value of the charge for the service dispensed with can be reasonable.

19. Quaere, whether an express carrier who does not himself encroach on rights of the public, and who submits to all necessary and proper regulations of the railroad company, cannot, without obtaining a judgment at law, have relief in equity against such an overcharge.

20. An express carrier who does not submit, or offer to submit, to such regulations, but insists on having preferential accommodations or facilities which could not be allowed without encroachment on rights of the railroad company and of the public, cannot be relieved before the final hearing.

21. Quaere, whether he can have relief at the final hearing. It seems that he may, in cases in which part of the decree relieving him may be an adjudication against his pretensions which are unfounded.

22. The charge of a railroad company for transporting packed parcels by rail, of the full sum which would be payable in the aggregate if they were not packed and were charged for severally, cannot be rightfully imposed upon the public generally, or upon express carriers, or other middlemen.

23. A court of law, and not a court of equity, has primary cognizance of the question of the right of the railroad company carrying packed parcels for a middleman who does not own them to charge him with any addition, however small, to what would otherwise be the regular charge for carrying the package in mass.

24. The legal right of the railroad company under the last head is not so clearly deniable as to warrant the summary decision of it against them by a court of equity.

25. A joint-stock company was organized under laws of a state, one of which provided that nothing contained in it should be construed to give to such company any rights and privileges as a corporation. The same law authorized such company to sue in the name of their president.

Quaere, whether such a company was a citizen of that state within the meaning of the 11th section of the judiciary act of September 24, 1789 [1 Stat. 73], defining the jurisdiction of the circuit court.

Upon the application of the complainant in each case for a preliminary injunction, affidavits on his part, and on that of the defendants, were exhibited. The complainant in the first case—a citizen of the state of New York—had, on August 28, 1872, become the holder of one hundred shares of the stock of the defendants. The complainant in the other case—a citizen of the state of New York—is president of a joint-stock company associated and organized in pursuance of laws of that state, under the name of "The Adams Express Company," with power to sue in the name of their president. These are chapter 258, of the Laws of 1849, and chapter 245, of those of 1854. The latter act provides, that nothing contained in it shall be construed to give to such a company any rights and privileges as a corporation. On the part of the defendants it was alleged that the shares of their stock held by the complainant Camblos were acquired by him on account and in the interest of the Adams Express Company, solely with a view to enable him to sue here ostensibly as a stockholder of the defendants, but really as an agent of the Adams Express Company, by whom the expenses of the suit in his name were to be borne. In the following statement of the case, the word "complainants," unless otherwise distinctly applied, will be understood as designating the Adams Express Company:

The two bills were precisely alike in their allegations and prayers of relief. They stated that, from the limitation of the proper business of railroads and other improved highways under corporate authority, to the routes between their termini and intermediate stations, there has been established for many years past an extensive independent business known as the express business; that those who conduct it serve the public as common carriers, by gathering small parcels, money, and commercial securities, at

local offices and the consignors' doors, and delivering them to the consignees' doors, away from the stations on railroads or other great highways, as well as by collecting bills of exchange, notes, and commercial paper, and assuming responsibility for the risk of the loss thereof of their customers; and, where railroads exist, conveying the express packages thereon, and principally in the cars of the railroad companies; that, the business being principally valuable to the community from the speed with which the packages are forwarded, it has been principally conducted in cars attached to, or forming part of, the passenger trains, as distinguished from the ordinary freight trains of the railroad; that the express business is valuable from the responsibility with which it is conducted, and the facilities it affords; that it required from those establishing it a large outlay without immediate remuneration, in acquiring the confidence of the community, and the organization and requisite information of their agents; and that the complainants for many years past have thus acquired "an enormously valuable express business extending throughout the country, to the great advantage of the public," conducting it in their own name, and also in that of other private associations whose interests have been acquired, and some of whose names have been retained by the complainants for their own convenience.

The defendants were incorporated under an act of the legislature of Pennsylvania of April 4, 1833, with power to make a railroad from Philadelphia to Reading, and with all incidental privileges, franchises and immunities, but none other than such as might be necessary or incident to the making and maintaining of the road and the conveyance of passengers, and the transportation of the mail and of goods, etc., thereon. The act gives to the defendants power from time to time to establish and alter or amend rules and regulations for the due ordering of all travelling and transportation upon and for the preservation of the road, and to prescribe the kinds and descriptions of cars, etc., to be used on it, and to regulate speed and transit; provided that the toll on any species of property should not exceed an average of four cents per ton per mile, nor upon each passenger an average of two cents per mile. It was enacted that after a certain time an annual report should be made by the company, under one head of which the amounts received for tolls and transportation, and the rates charged, were to be stated. By subsequent acts of the legislature passed in 1837 and 1838, the defendants were authorized to extend the railroad to Pottsville, with all the privileges granted, and subject to the same restrictions imposed by the above-mentioned act of April 4, 1833. An act of April 3, 1862 (P. L. p. 234), extended to the defendants the privileges which had been granted to a navigation company by the first section of an act of April 5, 1859 (P. L. 1859, 372), enabling them "to contract for the transportation of coal and other articles upon their navigation, and to and from points beyond the same, and to include the charge for such transportation in their charge for tolls." The defendants were "operating" their railroad and certain connecting railroads of great extension, when an agreement of August 1, 1866, was made between them and the complainants transacting the express business under one of their own names. By this agreement, the complainants were, for the carriage of a safe not exceeding seven cubic feet in capacity, and other express freight, and the messenger or agent accompanying the same, to have the use on one of the defendants' passenger trains of an eight-wheeled car, and on each of several others of their passenger trains of a certain fractional part of such a car. There were provisions for the retention by the defendants of the absolute control and regulation of the trains and lines. The weight of the express matter, including the safe and its contents, was not to exceed 12,000 pounds in any one eight-wheeled car, nor more than a proportional weight in any fractional part of such a car. There were various provisions for expediting and facilitating loading, unloading, and weighing. Payments were to be made monthly by the complainants of not less than $400 for the transportation of their messengers and safes and other freights; and they were, in addition, to pay rates of transportation upon all freight other than the safes and their contents, greater by twenty-five per cent. than the rates charged from time to time by the defendants in their schedules or tariff of freights; provided that the monthly payments should never be less than $2,000, which amount, as a minimum, was to be payable to the defendants whether such rates in addition to the $400 should equal that sum or not. The complainants were to send a messenger and safe, and to furnish express facilities to the public to the extent to which they could, under this contract, be furnished, at least once a day each way, between designated points. If the defendants should thereafter transport any express matter for others doing an express business, at more favorable rates than those agreed on as above, there was to be a corresponding reduction of the amounts payable by the complainants. The 8th article of this agreement provided that the defendants should not be, directly or indirectly, liable or responsible to any persons whomsoever, for any loss, or damage, or injury, which may happen to any property of any kind, connected with, belonging to, carried for, or offered to be carried for, the complainants under this contract, or otherwise howsoever, nor for any injury happening to or sustained by any employe, servant, or agent of the complainants, or any persons

in any manner connected with them, nor for the death of any such person while upon or about the railroad, or property of the defendants, while upon the business of the complainants, whether such loss or damage, damage to property, injury to or death of any such person, should have been occasioned by or through the negligence, or omission, or default of the defendants, their agents or employes, or other persons, or otherwise howsoever, but from all such loss, injury, or damage, should be by the complainants at all times indemnified; it being distinctly understood and agreed, as part of the consideration of the contract, that the complainants assumed and took upon themselves, and undertook to pay, and provide for, and indemnify the defendants against all and every claim and demand for loss and injury of every nature, to life, person, or property, arising from the performance of this contract, or any matter directly or indirectly connected therewith. And the complainants further agreed to indemnify the defendants from all loss or damage, to which they might be subjected, for or on account of any injury to persons or property caused by or resulting from any explosive, combustible, noxious or deleterious substance, transported or held by the defendants for the complainants. The contract was to continue in force until the expiration of sixty days from the date of the service of written notice by either of the parties, on the other, of their wish that it should terminate, and was then to become void, etc., except for the enforcement of claims then acquired and existing.

The defendants, in the latter part of 1870, became lessees for a long term of all the franchises, railroad, and property of the Philadelphia, Germantown, and Norristown Railroad Co. This company was incorporated by an act of February 17, 1831, with authority to make the latter road, and to charge and receive tolls, and for freights, in and for the transportation of goods, etc., and for the conveyance of passengers, at prescribed maximum rates; provided that all persons using the road for the transportation of persons or commodities should only use such cars, etc., adapted to the road as the company should prescribe. A supplementary act of April 7, 1832, enabled the latter company to own and place locomotive engines on the road and transport persons, merchandise, etc., for prices or compensation to be agreed upon. Since the lease of this road by the defendants, it has been called the Germantown and Norristown branch of their railroad. Under the date of May 7, 1872, it was agreed between the defendants and the complainants, by another of their names, that the defendants should provide for the use of the complainants one eight-wheeled car suitable for the business of an express company, and transport the same daily (Sundays excepted) between Philadelphia and Chestnut Hill, on the Germantown and Norristown branch of the railroad of the defendants, twice each way—attached to passenger trains; and also transport for the complainants one eight-wheeled car (to be provided by the complainants themselves), twice each way daily (Sunday excepted), between Philadelphia and Norristown, on the same branch—attached to passenger trains; and issue passes for the transportation, free of charge, of one employe of the complainants in each of the said cars, upon its two daily round trips. If the defendant should, during the continuance of the agreement, enter into an agreement with any person or persons, in an express business, for the transportation over the said Germantown and Norristown branch, of express matter, upon terms more favorable than were therein contained, the complainants were to have their express matter transported upon the same terms. In consideration whereof, the complainants agreed to pay to the defendants during the continuance of this agreement, three hundred dollars upon the first of each month; not to make any demand or bring any suit against the defendants, for any loss, injury, or damage, from any cause whatever, that might occur to the car furnished by the complainants, or to the goods transported in either of the cars; and to indemnify the defendants from all such demands or suits by any person whatever, and from all demands or suits by reason of any injury to or death of any employe of the complainants, it being the intention and agreement of the parties that the car furnished by the complainants, and the goods contained in either of the cars, as well as the employes of the complainants, should be transported solely at their risk, and without any responsibility whatever on the part of the defendants. The contract was to continue in force until the expiration of sixty days from the service of written notice by either party, upon the other, of an intention to determine the same; whereupon it should become void, except for the collection of any sum then due by the complainants to the defendants. This agreement contained a provision that it was to be deemed and taken to have been in force from April 1, 1871.

On June 19, 1872, the defendants gave to the complainants, under each of the contracts of August 1, 1866, and May 7, 1872, notice that it would become void upon the expiration of sixty days. The defendants allege that there was no more necessity for the intervention of the complainants in the transportation of express freight and small packages than there would have been for such intervention between the public and the defendants in the transportation of coal or passengers in the freight trains, and that it would not have been just to permit the complainants to continue to carry away a considerable profit which really belonged to the defendants' stockholders. On August 21,

1872, the defendants gave public notice that on and after September 2, they would take charge of the express business in all its details, on their road, and its branches, and would be fully prepared to accommodate the public in the rapid transmission of money and freight entrusted to their care; adding that direct connections would be made with the "Delaware, Lackawanna, and Western Express" for New York city and state, the eastern states and Canadas, and all points on the Delaware, Lackawanna, and Western Lackawanna and Bloomsburg, and Morris and Essex Railroads, and at reduced rates; that particular attention would be given to the collection of checks, drafts, notes, bills, etc., and prompt returns made; that orders for articles to be returned by express would be carried free of charge, and delivered at once upon arrival of trains, and goods called for and returned by next train, if ready for shipment; and that telegrams ordering shipments of packages by express would be forwarded over the lines of the Philadelphia, Reading, and Pottsville Telegraph Company at half rates. "For further information" application was to be made at the "general office" of the "Philadelphia and Reading Railroad Express Department," and at the "branch office" of the same department. The defendants explain their connection, mentioned in this notice, with the Delaware, Lackawanna, and Western Express, by stating that it was to facilitate the transportation of express freight to destinations beyond their own railroads on the customary terms, and that they had offered to transfer, on similar terms, the entire business of such ulterior transportation to the complainants, who had refused the offer. The complainants received from the defendants, in a letter of August 26, 1872, information that upon their regular freight trains they would carry freights for the complainants in the same manner as "for other shippers;" that the complainants could not be furnished with separate cars for their goods, nor could the defendants engage to forward them in any given time, but that they should be loaded and despatched in the same order as consignments to all other parties. "Respecting the running of a private car over the Norristown branch," the words of the defendants were: "We are very much cramped for room at our depot, on Ninth street, and we should on that account prefer handling the goods in our own cars. But, if you prefer to furnish a car, it can be done, although we shall not be able to promise as good despatch as would be given to our own cars, from the fact that an extra shift will be required, and this could not always be insured in time to get the car out by any particular train." The complainants inquired generally, and also under specific heads, what facilities would be afforded them for the transportation of their express matter on the passenger trains of the defendants over their several roads and the respective branches. The defendants, in two letters of August 30, 1872, answered that if the complainants desired to continue in the express business in the defendants' region and to make use of the defendants' express department for transportation, the defendants would at all times be glad to transport any of the express matter of the complainants upon the same terms paid by the public, and would endeavor to attend to the receipt and delivery with promptness, despatch, and in all cases, on terms as favorable as to "any other shipper." The defendants added: "As we do not intend to set apart in our express cars any particular space for any one shipper, we cannot consent to do so for your company. Neither can we permit your messenger to occupy any space in our express cars. As we are obliged to keep up a sufficient equipment to receive from and deliver to the public all express matter transported over our lines, we cannot consent to make any abatement to you in consideration of your receiving and delivering goods." The defendants stated further that it was not their intention to permit the cars of any express company to run with passenger trains.

On September 2, 1872, the defendants commenced, and they have since continued, the business of transporting express matter in cars of their own, run with their passenger trains, each express car being attended by their messenger in charge of the express matter. For the collection and delivery of such matter at the termini of its lines, the defendants employ horses and wagons. The defendants collect and transport bank notes or other moneys in payment of checks, drafts, and bills intrusted to them; and for so doing receive compensation. Their president's affidavit states that "such money or other securities are transported as any other freight of similar character and value." The defendants had "instituted" a tariff of charges to the public for the conveyance of express matter. They refused, as they say, to show this tariff to the complainants without refusing to make known to them the charge for any particular item of express matter offered for transportation. An interrogatory of the bill asks a disclosure of all the regulations adopted by the defendants for the management of the express business which they have undertaken. In September, 1872, the relations of the parties becoming practically controversial, several disputes occurred. In what follows, "express freights" will be understood as including all articles or parcels of such small weight and limited bulk that they are or may be conveniently transportable in fast passenger trains, and all orders and securities for money and other written or printed papers, of which transportation otherwise than by mail is not unlawful. The complainants demanded, as proportional to the magnitude and expansion of their express business, facilities and accommodations on

the scale of those which they had conventionally received from the defendants until the annulment of the contracts of August, 1866, and May, 1872. The defendants objected that certain of the facilities and accommodations thus demanded would be preferential, and that the allowance of them would therefore be improper. The questions under this head were: Whether the complainants could insist on having, in a passenger train, a car for their exclusive use, furnished by themselves or provided by the defendants, or on having a sufficient space to set apart for such use in a car of the defendants; whether the complainants could rightfully insist upon loading and receiving their express freights upon platforms or landings of the railway depots or stations at places where the defendants had established offices or warerooms for the reception and delivery of the freights; whether the complainants could insist upon the booking or waybilling, etc., being done by themselves, instead of by the defendants; or whether the complainants could require the admission of an agent or messenger in charge of their express freights to the car containing such freights, and require his freedom from those restraints upon ordinary passengers which might hinder his personal care of such freights during their transit by rail; and whether, if such an agent or messenger was admitted only as a passenger paying the ordinary fare, he should be allowed as baggage to be carried in the baggage car, a trunk containing express freight of the complainants, without being charged more than for its excess, if any, in weight above that allowed for an ordinary passenger's baggage and at the same rate. The other disputes were upon alleged overcharges by the defendants for the carriage of express freights. Their charge for the accessorial service with horse power, in carrying freights to and from the railway, was included in a single aggregate sum, which included also the charge for transportation by rail with steam power, without any discrimination between the amounts or values of the two services. The complainants, themselves bringing the freights to, and receiving them at, the railway, and thus making no use whatever of the horse power of the defendants, objected to the charge for its use, offering to pay the amount which would have been chargeable for the transportation by rail, according to the rates which had been usual until the defendants engaged in the accessorial business. This the defendants refused to accept. They exacted the aggregate sum, without making any abatement whatever. The complainants paid the whole charge under protest. As to the excess, it was contended for the defendants that no rebate whatever was requirable of them, and by the complainants that no rebate less than of the whole excess above the proper charge for transportation by steam upon the rails could be reasonable.

Another dispute arose thus: When several articles or parcels, all receivable at the same place or destination by the complainants, but there deliverable by them to several persons unknown to the defendants, were so bound or inclosed as to form together a single package not of inconvenient bulk or weight for transportation, the complainants required the defendants to receive such package for transportation upon their road at a rate of charge no higher than if the whole contents were owned by the complainants, or were intended for ultimate delivery to a single person. The defendants refused to carry the package at this rate, exacting the full aggregate amount which would have been chargeable if the several parcels had not been packed together. The whole charge was paid by the complainants, under protest as to the excess. Between the two extremes of the question as to packed parcels, a point argued was whether, if the whole additional charge was excessive and unreasonable, a less addition might not be properly made in order to cover the contingent risk of the defendants' liability to several actions at the suit of the unknown parties interested. The complainants do not appear to have brought any action at law to get back either of the two excesses in amount which they paid under protest. Besides the special contestations which have been mentioned, the complainants contended generally that carriage without steam power to or from the railway is a business wholly distinct from that of carriage by rail; that the charter of the defendants does not authorize them to engage in any other business of carriage than upon the rails, and moreover does not authorize them to receive any freight which is transportable upon their own road and beyond it, as consigned for the ulterior destination.

The purposes of the bills were threefold: First, by injunction, to prevent the defendants from continuing the competing business with horse power. Secondly, to compel, by mandatory injunction or decretal order, the allowance by the defendants to the complainants of the disputed facilities and accommodations. Thirdly, to prevent, by injunction, the continuance of the alleged overcharges.

The defendants, denying wholly that the complainant's case had any merits, objected that the questions in dispute were primarily cognizable, not in equity, but at law, and if this were otherwise, could not be properly considered until the final hearing; that the complainants could not sue as a citizen of the state of New York, under the 11th section of the judiciary act of 24th September. 1789 [1 Stat. 73], and could not sue in equity out of that state, in the name of their president.

Geo. L. Crawford and Benjamin Harris Brewster, for plaintiffs.

A. D. Campbell and James E. Gowen, for defendants.

[2] [The plaintiffs presented the following points and authorities:

### [A. As to the Remedy.

[I. The Shareholder's Bill. When a corporation attempts to misapply its corporate powers, funds, or credits, in acts, ultra vires, violating its charter, or lessening the shareholder's dividends and the value of his shares, it will be restrained upon the application of a single shareholder, by a bill on behalf of himself and the others in like interest. Dodge v. Woolsey, 18 How. [59 U. S.] 331, 341–343; Sandford v. Catawissa, W. & E. R. Co., 12 Harris [24 Pa. St.] 378; Colman v. Eastern C. R. Co., 10 Beav. 1; Cohen v. Wilkinson, 12 Beav. 125; Salomons v. Laing, Id. 377; Graham v. Birkenhead, etc., Ry. Co., Id. 460; Munt v. Shrewsbury, etc., R. Co., 13 Beav. 1; Logan v. Earl of Courtown, Id. 22; Gregory v. Patchett, 33 Beav. 595; Bagshaw v. Eastern U. R. Co., 7 Hare, 114; Simpson v. Denison, 10 Hare, 50; Maunsell v. Midland G. W. R. Co., 1 Hem. & M. 130; Great Western R. Co. v. Rushout, 5 De Gex & L. 290, 293; Winch v. Birkenhead, etc., Ry. Co., Id. 562; Beman v. Rufford, 1 Sim. (N. S.) 550; Attorney General v. Great Northern R. Co., 1 Drew & S. 154, 6 Jur. (N. S.) 1006; Charlton v. Newcastle & C. R. Co., 5 Jur. (N. S.) 1096; Hare v. London & N. W. R. Co., 30 Law J. Ch. 820; Forrest v. Manchester, S. & L. R. Co., 7 Jur. (N. S.) 887; Bloxam v. Metropolitan R. Co., 3 Ch. App. 337; Caledonian & D. J. R. Co. v. Magistrates, 2 Macq. 391; Dun. Nav. Co. v. North Midland R. Co., 1 Eng. Ry. & Canal Cas. 135; Kemp v. London & B. R. Co., Id. 495; Bell v. Hull & S. R. Co., Id. 636; March v. Eastern R. Co., 40 N. H. 548, 43 N. H. 515; Pratt v. Pratt, 33 Conn. 446; Gifford v. New Jersey R. & T. Co., 2 Stockt. [10 N. J. Eq.] 171; Stevens v. Rutland & B. R. Co. [29 Vt. 545]. Though the unauthorized works or business be beneficial to the corporation. Munt v. Shrewsbury & C. R. Co., 13 Beav. 1; Beman v. Rufford, 1 Sim. (N. S.) 550; Caledonian & D. J. R. Co. v. Magistrates, 2 Macq. 391. That the shareholder purchased his stock for the purpose of filing the bill, and sued at the instigation and request of a rival interest, and that his motives and feelings were adverse to the corporation, is no defense. Colman v. Eastern C. R. Co., 10 Beav. 1; Beman v. Rufford, 1 Sim. (N. S.) 550; Graham v. Birkenhead, etc., Ry. Co., 12 Beav. 460; Hare v. London & N. W. R. Co., 30 Law J. Ch. 820; Attorney General v. Great Northern R. Co., 1 Drew & S. 154, 6 Jur. (N. S.) 1006; Forrest v. Manchester, S. & L. R. Co., 7 Jur. (N. S.) 887; Bloxam v. Metropolitan R. Co., 3 Ch. App. 337; Seaton v. Grant, 2 Ch. App. 459; Sandford v. Catawissa, W. & E. R. Co., 12 Harris [24 Pa. St.] 378. That the bill was properly framed on behalf of those only in interest, who can take the

[2] [From 4 Brewst. 563.]

benefit of the limited jurisdiction. Bacon v. Robertson, 18 How. [59 U. S.] 480. That the corporation was the proper defendant, and it was not necessary to add the directors. Bagshaw v. Eastern U. R. Co., Winch v. Birkenhead, etc., Ry. Co., Beman v. Rufford, Salomons v. Laing, Sandford v. Catawissa, W. & E. R. Co.,—all of which were before cited. See text-books: Drew. Inj. 194, 286; Walf. Rys. 153, 371, 404, 405; Hodges, Rys. 68 et seq.; 2 Shelf. Rys., 114, 125, 163· Godef. & S. Rys., 72 et seq.; 2 Redf. R. R. 327–336.

[II. The Express Company's Bill. That a constitutional or statutory privilege was peculiarly the subject of equitable protection by injunction. Hil. Inj. c. 25, p. 389. That equity had undoubted jurisdiction to interfere by injunction, where public officers are proceeding illegally under a claim of right to the injury of the rights of others, where the acts are a breach of trust, or acts of irreparable mischief, or involving a multiplicity of suits, or otherwise invite equitable jurisdiction. Greene v. Mumford, 5 R. I. 475; Mohawk & H. R. Co. v. Artcher, 6 Paige, 83; Conover v. Mayor, etc., of New York, 25 Barb. 513; Frewin v. Lewis, 4 Mylne & C. 254; Hil. Inj. c. 24, p. 383; Manderson v. Commercial Bank, 28 Pa. St. 379; Osborn v. Bank of U. S., 9 Wheat. [22 U. S.] 838–846; Boston W. P. Co. v. Boston & W. R. Corp., 16 Pick. 525. That the express company had a right to sue in the name of their president, and that their powers were given by the following statutes of New York: Laws 1849, c. 52; 1851, c. 455; 1853, c. 153; 1854, c. 245; 1867, c. 289; 1868, c. 290; 1869, c. 157.

### [B. As to the Right.

[I. That the defendants were bound to carry for all owners or express bailees of parcels, including said Adams Express Co., without partiality, preference, or advantage to the defendants themselves, or any one else. That railroad companies, though called private as contradistinguished from public, were not such private corporations as manufacturing companies, and were public as distinguished from them, their uses being all public. Dartmouth College v. Woodward, 4 Wheat. [17 U. S.] 668; Rundle v. Delaware & R. Canal [Case No. 12,139]. That whenever the public, through its agents, deem the franchise of a railroad company injurious, they could, under the unlimited and discretionary clause in most charters, revoke it. Com. v. Wilkinson, 16 Pick. 175; Newburyport Turnpike Corp. v. Eastern R. Co., 23 Pick. 326; Inhabitants of Worcester v. Western R. Corp., 4 Metc. [Mass.] 564; Enfield Toll-Bridge Co. v. Hartford & N. H. R. Co., 17 Conn. 40; Bloodgood v. Mohawk & H. R. Co., 14 Wend. 57; Beekman v. Saratoga & S. R. Co., 3 Paige, 45; Sharpless v. Mayor, etc., of Philadelphia, 9 Harris [21 Pa. St.] 149; Moers v. City of Reading, Id. 188; Sandford v. Catawissa, W. & E. R. Co., 12 Harris [24

Pa. St.] 378; Chicago, B. & Q. R. Co. v. Parks, 18 Ill. 464; Galena & C. U. R. Co. v. Rae, Id. 490. By their obligations as common carriers. That the defendants, being empowered by their charter, with the corelative duty to become transporters upon, as well as to maintain their railway for tolls, and publicly professing to carry for others in respect to the matters complained of, were liable as common carriers. Johnson v. Midland Ry. Co., 4 Exch. 367; Fuller v. Naugatuck R. Co., 21 Conn. 559; Ang. Carr. p. 84, § 78; Thomas v. Boston & P. R. Co., 10 Metc. [Mass.] 475; Chicago & A. R. Co. v. Thompson, 19 Ill. 584; Illinois Cent. R. Co. v. Frankenberg, 54 Ill. 95. That "carriers regarded in law as if they were in the public service, and their obligations do not arise ex contractu." Saltonstall v. Stockton [Case No. 12,271]; Hannibal & St. J. R. Co. v. Swift, 12 Wall. [79 U. S.] 270. That it is the duty of a common carrier to receive and carry all goods offered, if he has requisite convenience, upon reasonable charge and conditions. 2 Show. 327; Story, Bailm. c. 6, § 508; 2 Kent, Comm. 599; Galena & C. U. R. Co. v. Rae, 18 Ill. 489, 490; Audenried v. Philadelphia & R. R. Co., 18 P. F. Smith [68 Pa. St.] 380; Case of Monopolies, 11 Coke, 86; 3 Inst. 181; 4 Bl. Comm. 159; 4 Jac. Law Dict. p. 307. That monopolies are void by the common law, being against the freedom of trade, discouraging labor and industry, and putting it in the power of particular persons to set what price they please on a commodity. 1 Hawk. P. C. c. 79, § 2; Moore, 591; Mitchell v. Reynolds, 10 Mod. 130. As to instances of involuntary restraints by charter which are void, see 2 Rolle, Abr. 214; 3 Inst. 182; 11 Coke, 84; Moore, 671; 1 W. Jones, 321; 3 Mod. 75; Willes, 384; 1 Saund. 312c.; 1 Rolle, 364; Lutw. 562; 1 Comb. 269; 5 Mod. 104–106; Comb. 372; 1 Rolle, 4; 1 Ld. Raym. 113; Moore, 576; 1 Bulst. 11; Norwich Gaslight Co. v. Norwich City Gas Co., 25 Conn. 19; Ang. & A. Corp. § 336; Dunham v. Trustees of Rochester, 5 Cow. 462; Hayden v. Noyes. 5 Conn. 391; Grant, Corp. 80. In reference to charge for parcels, see Crouch v. London & N. W. R. Co. (1849) 2 Car. & K. 789; Parker v. Great Western R. Co. (1844) 7 Man. & G. 253; Edwards v. Great Western R. Co. (1851) 73 E. C. L. 588; Parker v. Bristol & E. Ry. Co. (1851) 6 Exch. 702; Crouch v. London & N. W. Ry. Co. (1854) 25 Eng. Law & Eq. 287; Crouch v. Great Northern Ry. Co. (1854) Id. 449. 9 Exch. 556; Finnie v. Glasgow & S. W. Ry. Co. (1855) 34 Eng. Law & Eq. 21; Crouch v. Great Northern Ry. Co. (1856), 11 Exch. 742. In regard to undue preference, see Ransome v. Eastern C. Ry. Co. (1857) 1 J. Scott (N. S.) [1 C. B. N. S.] 437, 38 Eng. Law & Eq. 231; Oxlade v. Northeastern Ry. Co. (1857) 87 E. C. L. 454, 1 J. Scott (N. S.) [1 C. B. N. S.] 454; Marriott v. London & S. W. Ry. Co. (1857) 1 J. Scott (N. S.) [1 C. B. N. S.] 499; Baxendale v. North Devon Ry. Co. (1851) 3 J. Scott (N. S.) [3 C. B. N. S.] 324; Harris v. Cockermouth & W. Ry. Co. (1858) Id. 694; Piddington v. Southeastern Ry. Co. (1858) 5 C. B. (N. S.) 111, 94 E. C. L. 111; Baxendale v. Great Western Ry. Co. (1858) 5 J. Scott (N. S.) [5 C. B. N. S.] 309, 336; Garton v. Great Western Ry. Co., Id. 669; Garton v. Bristol & E. Ry. Co. (1859) 6 J. Scott (N. S.) [6 C. B. N. S.] 639; Id. (Exch. Ch.) 5 Jur. (N. S.) 1172; Id. (House of Lords) 7 Jur. (N. S.) 173; Id. (1861) 1 Best & S. 112; Baxendale v. Great Western Ry. Co. (1863) 14 J. Scott (N. S.) [14 C. B. N. S.] 1; Sutton v. Great Western Ry. Co. (1865) 3 Hurl. & C. 800; Baxendale v. Southwestern Ry. Co. (Exchequer, 1866) 12 Jur. (N. S.) 274; Palmer v. London, B. & S. C. Ry. Co. (1871) 40 Law J. C. P. 133, L. R. 6 C. P. 194; Parkinson v. Great Western Ry. Co. (1871) 40 Law J. C. P. 222, L. R. 6 C. P. 554; Sandford v. Catawissa, W. & E. R. Co., 12 Harris [24 Pa. St.] 378; New England Express Co. v. Maine Cent. R. Co., 57 Me. 188; 10 Mees. & W. 397; 3 Eng. Ry. & Canal Cas. 193; 49 E. C. L. 253; 73 E. C. L. 583; Bennett v. Dutton, 10 N. H. 481; Vincent v. Chicago & A. R. Co., 49 Ill. 37; Webber v. Gage, 39 N. H. 182; Watson v. Sutherland, 5 Wall. [72 U. S.] 74; Chicago & N. W. Ry. Co. v. People, 10 Am. Law Reg. (N. S.) 588. That a common carrier "exercises a public employment." Coggs v. Bernard, 2 Ld. Raym. 909.

[II. That the defendants have no powers but those the strictest construction of their charters exhibits. Charles River Bridge v. Warren Bridge, 11 Pet. [36 U. S.] 420–544; Richmond R. R. Co. v. Louisa R. R. Co., 13 How. [54 U. S.] 71; Ohio Life Ins. & Trust Co. v. Debolt, 16 How. [57 U. S.] 435; Rice v. Minnesota & N. W. R. Co., 1 Black [66 U. S.] 358–380; Jefferson Branch Bank v. Skelley, Id. 436–446; Oswego Falls Bridge Co. v. Fish, 1 Barb. Ch. 547; Shorter v. Smith, 9 Ga. 517; Mayor, etc., v. Macon & W. R. Co., 7 Ga. 221; Thorpe v. Rutland & B. R. Co., 27 Vt. 140; State v. Chase, 5 Ohio St. 528. That their charters are to be construed by the laws of the states granting them. Smith v. Kernochen, 7 How. [48 U. S.] 198. That Pennsylvania had judicially declared the rule of strictest construction. Packer v. Sunbury & E. R. Co., 19 Pa. St. 211–218; Pennsylvania R. Co. v. Canal Com'rs, 21 Pa. St. 9, 22; Com. v. Franklin C. Co., Id. 117; Com. v. Erie & N. E. R. Co., 27 Pa. St. 339, 351; Com. v. Central P. R. Co., 52 Pa. St. 506. That the rule of strictest construction applies to the right to take toll, freight, or fares. Camden & A. R. & T. Co. v. Briggs, 2 Zabr. [22 N. J. Law] 623. That the rule applies to an alleged grant interfering with public trades. or commerce, or convenience. Stormfeltz v. Manor Turnpike Co., 13 Pa. St. 533; McLeod v. Burroughs, 9 Ga. 213; Justices v. Griffin, etc.. Road Co., Id. 475, etc. That the rule applies to railroad franchises. Hodg. Rys. 68 et seq., and cases cited; Godef.

& S. Rys. 61; 2 Shelf. Rys. 2, 114, 125, et seq., and cases cited; 1 Redf. R. R.. 50. 235, 7, 8; 405, 9, 28; 354, 4, 518, 614; 2 Redf. R. R. 445; Colman v. Eastern C. R. Co., 10 Beav. 1; Munt v. Shrewsbury & C. R. Co., 13 Beav. 1; Simpson v. Denison, 10 Hare, 51; Maunsell v. Midland G. W. R. Co., 1 Hem. & M. 130; Beman v. Rufford, 1 Sim. (N. S.) 550; Forrest v. Manchester, S. &· L. R. Co., 30 Beav. 40. That an accident to be carried by a principal grant must be necessary and proper, and usually appurtenant. Sumner v. Marcy [Case No. 13,609]. That the defendants received their corporate franchises with the duty to exercise them (Cohen v. Wilkinson, 12 Beav. 125; Graham v. Birkenhead, etc., Ry. Co., Id. 460; Reg. v. Bristol Dock Co., 2 Eng. Ry. & Canal Cas. 599); and, having completed and operated their railroads for over a generation, never before exercised or claimed to exercise the franchise in question, and recognized the plaintiff's right thereto. That the power to make a road and take tolls does not authorize establishing a line of stage coaches thereon. Downing v. Mount Washington Co., 40 N. H. 230; Wiswall v. Greenville, etc., Road Co., 3 Jones Eq. (N. C.) 183. That the carriage of goods by an agent of a railroad company, from a point distant from the line of the road, to be transported on the line, was distinct from the general objects of the company. Missouri Coal & Oil Co. v. Hannibal & St. J. R. Co., 35 Mo. 84. That the old rule that a carrier must deliver was not applicable to railroad companies, because they had fixed tracks and fixed points of termination. Norway Plains Co. v. Boston & M. R. Co., 1 Gray, 263; People v. Chicago & A. R. Co., 55 Ill. 95; Mayor, etc., v. Macon & W. R. Co., 7 Ga. 221.

[III. That the duty of the defendants to permit the Adams Express Company's express car to be drawn on any train whereon the defendants carry their own express car, and for charge not exceeding their statutory toll per ton per mile, with reasonable compensation for motive power and incidental service, equally to such part of their charge to others for whom they perform the entire collection, carriage and delivery, as was fairly referable to the part of said entire services—followed from their statutory obligation, and that equal justice required by the nature of their franchise, their obligations as common carriers, and the principles of public policy. Hodg. Rys. 504, 539. That the equity jurisdiction, power, and practice of the circuit court of the United States, under the constitution, (article 3, § 2), the process acts of September 24, 1789 (section 11), May 8, 1792 (section 2), May 19, 1828 (sections 1, 3), June 1, 1872, and the rules of court, were in nature, extent, and forms of procedure as administered in the English court of chancery, and thus the same in all the circuits, and not as modified in the several states. 1 Kent, Comm. 342; Story, Eq.

§ 57; Robinson v. Campbell, 3 Wheat. [16 U. S.] 221; U. S. v. Howland, 4 Wheat. [17 U. S.] 115; Boyle v. Zacharie, 6 Pet. [31 U. S.] 657, 658; Livingston v. Story, 9 Pet. [34 U. S.] 655, 656; Story v. Livingston, 13 Pet. [38 U. S.] 368, 369; Ex parte Whitney, 13 Pet. [38 U. S.] 407, 408; Gaines v. Relf, 15 Pet. [40 U. S.] 14, 17; Pennsylvania v. Wheeling & B. Bridge Co., 13 How. [54 U. S.] 563, 564; Fontain v. Ravenel, 17 How. [58 U. S.] 384; Barber v. Barber, 21 How. [62 U. S.] 590-592; Thomson v. Central Ohio R. Co., 6 Wall. [73 U. S.] 137; Walker v. Dreville, 12 Wall. [79 U. S.] 442; Mayer v. Foulkrod [Case No. 9,341]; Gordon v. Hobart [Id. 5,609]; Fletcher v. Morey [Id. 4,864]; Cropper v. Coburn [Id. 3,416]; Loring v. Marsh [Id. 8,515]; Lorman v. Clarke [Id. 8,516]; Dow v. Chamberlain [Id. 4,037]; U. S. v. Parrott [Id. 15,999]. In regard to the protection of rights by injunction, they cited: Durell v. Pritchard, 1 Ch. App. 244-250; Great North, etc., R. Co., v. Clarence R. Co., 1 Colly. 507; Spencer v. London & B. R. Co., 8 Sim. 193; London & N. W. R. Co. v. Lancashire & Y. R. Co., 36 Law J. Ch. 479; Dewhirst v. Wrigley, 1 Coop. Ch. Pr. 319; Robinson v. Lord Byron, 1 Browne, Ch. 588; Earl of Mexborough v. Bower, 7 Beav. 127; Westminster, etc., Co. v. Clayton, 36 Law J. Ch. 476; Rankin v. Huskisson, 4 Sim. 13; Martyr v. Lawrence, 2 De Gex, J. & S. 261; 10 Jur. (N. S.) 858; Hervey v. Smith, 1 Kay & J. 389-394; Attorney General v. Borough of Birmingham, 4 Kay & J. 547; Goodale v. Goodale, 16 Sim. 316; Whittaker v. Howe, 3 Beav. 383-395; Greatrex v. Greatrex, 1 De Gex & S. 692, 11 Jur. 1052; Evitt v. Price, 1 Sim. 483; Sloo v. Law, [Case No. 12,957]; Manderson v. Commercial Bank, 28 Pa. St. 379; Baxendale v. North Devon Ry. Co., 3 J. Scott (N. S.) [C. B.] 333; Ransome v. Eastern C. R. Co., 38 Eng. Law & Eq. 231-236; In re Oxlade, 87 E. C. L. 497; Harris v. Cockermouth & W. Ry. Co., 91 E. C. L. 693; Baxendale v. Great Western Ry. Co., 94 E. C. L. 335; Garton v. Great Western Ry. Co., Id. 669; Same v. Bristol & E. Ry. Co., 95 E. C. L. 639; Palmer v. London, B. & S. C. R. Co., 40 L. J. C. P. 133; L. R. 6 C P. 194; In re Marriott, 87 E. C. L. 514; Parkinson v. Great Western R. Co., 40 L. J. C. P. 222, L. R. 6 C. P. 544.

The defendants presented the following points and authorities in regard to the plaintiff Camblos:

[I. That the court of equity could not be asked to interpose by a preliminary injunction to protect a suitor from risk incident to a position which he had voluntarily assumed for the purpose of incurring the risk which he complained of. Kenton v. Union Passenger Ry. Co., 4 P. F. Smith. [54 Pa. St.] 453, 454; Stuart, V. C., in Ffooks v. London & S. W. Ry. Co., 19 Eng. Law & Eq., 14; Knight Bruce, L. J., in Rogers v. Oxford, W. & W. R. Co., 2 De Gex & J. 662; Forrest v.

Manchester, S. & L. R. Co., 4 De Gex, F. & J. 126, decided by Lord Westbury on appeal from M. R., 30 Beav. 40; Hare v. London & N. W. Ry. Co., 30 Law J. Ch. 280, 817, 2 Johns. & H. 80; Felder v. London, B. & S. C. R. Co., 1 Hem. & M. 489; Hattersley v. Earl of Shelburne, 31 Law J. Ch. 873; and Robson v. Dodds, L. R. 8 Eq. Cas. 301.

[II. That it was impossible to extend the principle on which a court of equity will, on proper occasions, enjoin a corporation at the suit of a single stockholder to a case like this. Ang. & A. Corp. (Ed. 1871) § 393; Dodge v. Woolsey, 18 How. [59 U. S.] 343; Mozley v. Alston, 1 Phil. Ch. 790; Foss v. Harbottle, 2 Hare, 492; Lord v. Copper Miners' Co., 2 Phil. Ch. 740; Baltimore & O. R. Co. v. City of Wheeling, 13 Grat. 40.

[III. That the mere character of the relief sought (except so far as an injunction against carrying on "the independent express business," or engaging in the business of collecting checks, drafts, etc., was asked for) showed that in no event could a preliminary injunction be granted. Audenried v. Philadelphia & R. R. Co., 18 P. F. Smith [68 Pa. St.] 370; Hooper v. Brodrick, 11 Sim. 47; Mocanaqua Coal Co. v. Northern Cent. R. Co. [9 Phila. 250]; Rogers Locomotive & Mach. Works v. Erie R. Co., 5 Green. Ch. [20 N. J. Eq.]; Sandford v. Catawissa, W. & E. R. Co., 12 Harris [24 Pa. St.] 378.

[IV. That the inconvenience that would result from granting a preliminary injunction would be incalculably greater than that which would result from refusing it; and even if the plaintiff's right to relief on a final hearing appeared to be indisputable, the court would refuse to interfere now.

[V. That the act incorporating the railroad company gave them such liberties, franchises, and privileges "as were necessary or incident to the making and maintaining of the railroad and the conveyance of passengers and the transportation of the mail and of goods, merchandise, and commodities thereon. Act April 4, 1833, § 2, proviso (P. L. p. 146). That the act of April 3, 1862 (P. L. p. 234), extended to the P. and R. R. R. Co. the privilege to "contract for the transportation of coal and other articles to and from points beyond their line, and to include the charge for such transportation in their charge for tolls." (1) That the right of a railroad company to acquit itself of responsibility by unloading goods at its depot seems to have been established. Shenk v. Philadelphia Steam Propeller Co., 10 P. F. Smith [60 Pa. St.] 109; Morris & E. R. v. Ayres, 5 Dutch. [29 N. J. Law] 393; Norway Plains Co. v. Boston & M. R. Co., 1 Gray, 263; Tanner v. Oil Creek R. Co., 3 P. F. Smith [53 Pa. St.] 411; 2 Pars. Cont. (5th Ed. 1864), p. 189. (2) That under the English decisions the mere reception by a railroad company of goods destined and marked for a point beyond its line implied a contract to deliver at the destination. Mus-

champ v. Lancaster & P. R. Co., 8 Mees. & W. 421; Bristol & E. Ry. Co. v. Collins, 5 Hurl. & N. 969; 7 H. L. Cas. 194; 2 Redf. Ry. (3d Ed.) § 12; Id. pp. 109, 194, c. 23, § 13; 1 Pars. Cont. (3d Ed.) 687; Jenneson v. Camden & A. R. & T. Co., 4 Am. Law Reg. 234; Camden & A. R. Co. v. Forsyth, 11 P. F. Smith [61 Pa. St.] 81; Pennsylvania R. Co. v. Berry, 18 P. F. Smith [68 Pa. St.] 272. "In England and upon the continent it is the practice for the companies themselves to carry parcels by express, which is here done chiefly by others, under contract with the railroad companies." 2 Redf. Ry. pp. 14, 15; South Wales Ry. Co. v. Redmond, 10 C. B. [N. S.] (100 E. C. L.) 675.

[VI. The defendants were common carriers, and as such were subject to no other rules or regulations than any other common carriers, incorporated or not. That every person had the right to place cars on their road, and to furnish the motive power required for their transportation. Boyle v. Philadelphia & R. R. Co., 4 P. F. Smith, [54 Pa. St.] 310; Pennsylvania R. Co. v. Sly, 15 P. F. Smith, [65 Pa. St.] 205. There is no rule of equality in regard to the charges of a common carrier. Fitchburg R. Co. v. Gage, 12 Gray, 393; Baxendale v. Eastern Counties Ry. Co., 4 C. B. [N. S.] (93 E. C. L.) 61; Branley v. South Eastern R. Co., 12 C. B. [N. S.] (104 E. C. L.) 63.

[The defendants argued in regard to the plaintiff Dinsmore, as follows:

[I. That the plaintiff's case was not such as to entitle him to an injunction against the transgression of the defendants' charter, alleged to have been involved in their engaging in what was described as the "express business." That neither he nor the association he represented held a share of the defendants' stock, hence no breach of the quasi trust relation between a stockholder and the corporation could be averred. That there was not even a contract relation between the plaintiff and the defendants, and, if there had been, such a relation would not of itself be a sufficient ground for interference of a court of equity. That no right of property claimed by the plaintiff was involved or imperilled; nor had the plaintiff established any right whatever which could be affected by the alleged usurpation of the defendants.

[II. That a court of equity could not grant the relief sought by the prayers in the plaintiff's bill to compel the defendants to extend to the Adams Express Co. certain facilities for the transportation of their freight. That the legal right, the infringement of which could be enjoined in equity, must be existing, continuing, and affecting property. Ges v. Pritchard, 2 Swanst. 414; Emperor of Austria v. Day, 3 De Gex, F. & J. 239; Kerr, Inj. p. 1; Sutton v. Southeastern Ry. Co., L. R. 1 Exch. 32; Pickford v. Grand Junction Ry. Co., 3 Eng. Ry. & Canal Cas. 538. That the chancery jurisdiction of the

federal courts was the same in all the states, and the rule of decision was the same in all; its remedies were not regulated by the state practice. Boyle v. Zacharie, 6 Pet. [31 U. S.] 648; Dodge v. Woolsey, 18 How. [59 U. S.] 347; Noonan v. Lee, 2 Black, [67 U. S.] 500; Gordon v. Hobart [Case No. 5,609]; Mayer v. Foulkrod [Case No. 9,341]; Dow v. Chamberlain [Id. 4,037]; 1 Brightly, Fed. Dig. 283.

[The English "Packed Parcels Cases": Held: That the statute relating to the railroad company required the charges to be reasonable. Pickford v. Grand Junction R. Co., 10 Mees. & W. 399. Held: That the charges of a railroad should be equal and reasonable under the English act. Parker v. Great Western Ry. Co., 7 Man. & G. (49 E. C. L.) 253. Carriers were charged for packed parcels; the public were not. Held: A violation of equality clause in statute relating to the railroad company. Parker v. Great Western Ry. Co., 11 C. B. (73 E. C. L.) 545; Edwards v. Same, Id. 588. The following cases are to the same point as the above: Crouch v. London & N. W. R. Co., 14 C. B. (78 E. C. L.) 254; Crouch v. Great Northern Ry. Co., 9 Exch. (Welsb. H. & G.) 556, 11 Exch. (Hurl. & G.) 740, *742. Held: That an action may be maintained by an express carrier's customer, in his own name, against a railway company for the loss of, or injury to, a carrier's packages. New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. [47 U. S.] 344; Ang. & A. Carr. (4th Ed.) §§ 98, 466, 494; 2 Redf. R. R. (3d Ed.) pp. 13, 17. Held: That there was no rule of equality at common law. Baxendale v. Eastern C. Ry. Co., 4 C. B. N. S. (93 E. C. L.) 63. Held: That a railway company was justifiable in charging a carrier a separate rate on each separate parcel addressed to different ultimate consignees, although the parcels were delivered to the carrier's agent, and were marked with the carrier's address. Garton v. Bristol & E. Ry. Co., 1 Best & S. (101 E. C. L.) 112. Held: That double charge for parcels packed together was unequal and unreasonable under the statute. Piddington v. South Eastern Ry. Co., 5 C. B. [N. S.] (94 E. C. L.) 111. Held: That neither the statute nor the common law required equality of charges. Branley v. South Eastern Ry. Co., 12 C. B. N. S. (104 E. C. L.) 63. Held: That the railway company must charge equal rates. Sutton v. Great Western Ry. Co., 3 Hurl. & C. (Exch. Ch.) 800, L. R. 4 H. L. 226; Parker v. Great Western Ry. Co., 6 El. & Bl. (88 E. C. L.) 77. Held: That a railway company cannot give undue preference to themselves in their separate capacity as carriers, other than on their line of railway. Baxendale v. Great Western Ry. Co., 5 C. B. N. S. (94 E. C. L.) 336. Held: That to constitute "an undue or unreasonable preference" within the act, by reason of an inequality of charge, it must be for travelling over the same line or the same portion of the line. Caterham Ry. Co.

v. London, B. & S. C. Ry. Co., 1 C. B. N. S. (87 E. C. L.) 410. Held: That an omnibus proprietor who carries passengers and their baggage for hire to and from a railway station, cannot maintain an action against the company for refusing to allow him to drive his vehicle into the station yard. Barker v. Midland Ry. Co., 18 C. B. (86 E. C. L.) 45. Held: That the granting of an exclusive privilege to one omnibus proprietor to enter the station yard was a breach of the statutory prohibition against the granting of undue and unreasonable preferences. In re Mariott, 1 C. B. N. S. (87 E. C. L.) 499. The contrary was held, on the ground of "no inconvenience to the public" having been shown. In re Beadell, 2 C. B. N. S. (89 E. C. L.) 509; In re Painter, Id. 701.

[Other illustrations relating to the exclusion of goods—vans—after a certain hour of the day, are found in Garton v. Bristol & E. Ry. Co., 6 C. B. N. S. (95 E. C. L.) 639, and Baxendale v. London & S. W. Ry. Co., 12 C. B. N. S. (104 E. C. L.) 758; Palmer v. London & S. W. Ry. Co., L. R. 1 C. P. 588. In reference to charging for cartage, see Garton v. Bristol & E. Ry. Co., 6 C. B. N. S. (95 E. C. L.) 639; Baxendale v. Great Western Ry. Co., 14 C. B. N. S. (108 E. C. L.) 1; Baxendale v. London & S. W. Ry. Co., L. R. 1 Exch. 137; Cumberland Valley R. Co.'s Appeal, 12 P. F. Smith [62 Pa. St.] 218; Boyle v. Philadelphia & R. R. Co., 4 P. F. Smith [54 Pa. St.] 310.] [3]

Before McKENNAN, Circuit Judge, and CADWALADER, District Judge.

McKENNAN, Circuit Judge. The prayers of these bills are the same. Although, in form, they invoke the preventive intervention of the court, they are founded upon the alleged denial of certain legal rights claimed by the Adams Express Company, and it is manifest that the only beneficial measure of relief would be a mandatory order, constraining the defendant to concede to the express company the exercise and enjoyment of the rights claimed by it. This it may be within the range of the power of the court to decree, but it ought to be done only under circumstances of special exigency, to avert the continuing injuriousness of clearly wrongful acts. As a method of enforcing the concession of a mere right, it is inconsistent with the object and appropriate functions of a preliminary injunction. In Lehigh Coal & Nav. Co. v. Lehigh Valley R. Co., referred to in Audenried v. Philadelphia & R. R. Co., 18 P. F. Smith [68 Pa. St.] 376, Mr. Justice Strong said: "A preliminary injunction ought never to be granted except in a clear case, and then only to prevent a substantial injury. Its purpose is to keep things in their existing condition until the case can be finally heard. As it is the strong arm of the law, it must be used only when necessity

requires it. And a preliminary injunction ·can·never be necessary when the thing sought to be restrained has been already done; for its province is not to undo, but to prevent and preserve." And in Farmers' R. Co. v. Reno, O. C. & P. Ry. Co., 3 P. F. Smith :[53 Pa. St.] 224, the same learned judge said: "The sole object of such an order is to pre-·serve the subject of the controversy in the ·condition in which it is when the order is made. It cannot be used to take property out of the possession of one party and put it into possession of the other. That can be accomplished only by a final decree." It is true the allowance of mandatory interlocutory injunctions has, to some extent, the sanction of the modern English practice. It has grown up upon the supposed authority ·of Lord Eldon, who made such an order, for the first time, in Lane v. Newdigate, 10 Ves. 193. But he evidently regarded it as ex-·ceptional, and while he considered the injury complained of as a clear invasion of the complainant's rights, demanding prompt rep-·aration, he declined to decree a specific correction of it by the defendant, but so avowedly framed his order as to "create the necessity" for the defendant doing what he was unwilling to order him directly to do. ·Such a case cannot be regarded as evidence of the existence of a uniform practice, or ·as a warrant for the establishment of one. It has certainly not led to such a result in this country, for in Audenried v. Philadelphia & R. R. Co., supra, Mr. Justice Sharswood :says with great force: "There are some few instances in England in which a mandatory order has been made in an interlocutory application, but they have been very extreme ·case, and ought not to be followed as precedents."

Is there anything, then, in the circumstances of the present case to demand a resort to so questionable a mode of interposition? The Adams Express Company is entitled to protection only against such illegal acts of the defendant as are prejudicial to its rights and interests. If the railroad company has assumed the exercise of any franchise not ·conferred by its charter, the express company is not authorized to call it to account. If, without right, it seeks to appropriate the profits of a business of which the express company before had the monopoly, it does ·not thereby incur any liability to the express company. Their relations to each other grew out of the corporate duties of the defendant as a common carrier, and it is only for a failure or refusal to perform any of these duties to the express company as a shipper that the latter has a right to complain. The transportation of its freight over the defendants' road is not denied to the express company, nor can it be. The parties disagree as to the regulations imposed and the rates demanded by the defendant. The right to rebate from the charges of the defendant, equal to the cost of collecting, trans-

·porting, and delivering parcels from and to the doors of the consignors and consignees, and the right to pay for transporting a package of parcels only the price charged for a separate one, are claimed by the plaintiff, and constitute the substantial subjects of the contention. Practically, only the profits to be derived from the express business on the Philadelphia and Reading Railroad are involved in it. Shall these profits accrue to the railroad company or to the express company? Are these questions of such urgent significance as to call for their decision before a final hearing? To decide them now, as must necessarily be done if the present motion is allowed, is, in effect, to decide them finally, because a final decree could not more fully secure to the plaintiff the enjoyment of what it claims than would an interlocutory injunction. Why should this be done in the absence of an answer and of the proofs necessary to a precise adjustment of the relative rights and duties of the parties, or without a trial at law? "To preserve the subject of the controversy in the condition in which it is" now, does not require it, but the effect would be to undo what has been done, to take away from the defendants the controverted rights now enjoyed by them and confer them upon the plaintiff. This can be accomplished appropriately only by a final decree. Nor has the complainant Camblos any better title to this summary relief than the express company. As a stockholder in the corporation defendant, his only interest is in being protected against the risk of loss. So long as those who manage the corporation keep within the limits of its charter, and commit, or propose to commit, no breach of their trust, he has no right to complain. In Dodge v. Woolsey, 18 How. [59 U. S.] 341, the court says: "It is now no longer doubted, either in England or the United States, that courts of equity in both have jurisdiction over corporations, at the instance of one or more of their members, to apply preventive remedies by injunction to restrain those who administer them from doing acts which would amount to a violation of charter, or to prevent any misapplication of their capitals or profits, which might result in lessening the dividends of stockholders, or the value of their shares, as either may be protected by the franchise if the acts intended to be done create what is, in the law, denominated a breach of trust." If the acts complained of are violations of the defendants' charter, as they are not, because concerning only the administration of its legal faculties, the mischief has been already done, —and a preliminary injunction could not avert their injurious consequences; and surely the value of the complainant's stock will not be impaired, or the dividends upon it lessened, by securing its participation in the profits of a business which he seeks to divert into another channel. And then as to the

apprehended liability of the defendants to the express company for damages, he has voluntarily sought the risk from which he asks to be protected. It is charged and not denied that he acquired his stock "on account and in the interest of the Adams Express Company, and solely with the view of giving himself a supposed status in court, to enable him to maintain the present suit ostensibly as a stockholder of the Philadelphia and Reading Railroad Company, but really as an agent of the Adams Express Company," and "that the expenses of the said suit are to be borne by the said company." And these averments are corroborated by the fact that his bill is filed at the same time with and is an exact counterpart of the express company's bill. He does not, therefore, come into court with a bona fide complaint as a stockholder really seeking protection, but as the auxiliary of another party whose proceeding is adverse to his interest as a stockholder. It is not a question of his motives, but of the genuineness of the character in which he presents himself, and of the good faith of his appeal for summary relief. A court of equity is not the redresser of simulated wrongs, nor will it exert its strong arm to relieve a complainant in a position which he has voluntarily assumed, with a full knowledge of its perils. The motion for a preliminary injunction is therefore denied.

CADWALADER, District Judge. I concur in the opinion of the circuit judge, and in his reasons. We have arrived at the same conclusion by processes of reasoning perfectly consistent, though not alike. His opinion, as delivered, is, almost independently of any question upon the merits, confined to that of remedy in the present stage of the cause. My opinion was formed upon a consideration of the merits of the whole controversy, reducing the numerous questions to two, and even dividing each of them, so as to leave only one point under each, open to future doubt. I was thus able to limit the question, which the circuit judge has considered at large, to these two points. But it was therefore necessary to form an opinion upon most of the other questions. This was done without any opportunity of consultation with him, until the present term. Either method of considering the case was proper. It had been very fully argued, and nothing could be added to the printed briefs of counsel. But if the circuit judge had either differed, or doubted, as to any part of my opinion, I would not have delivered it. He, however, concurs on every point; and is desirous that it should be considered as the opinion of both judges.

The case at the suit of the express company will be properly considered before any distinct consideration of the stockholders' bill. But certain points of argument which are more or less common to the two cases will, in considering the former one, be noticed somewhat more fully than might be necessary if it were alone before the court. Any question of supposed liability of the charter of the defendants to forfeiture, belongs only to the case under the stockholders' bill, as the circuit judge has clearly shown. But the interpretation and effect of the charter, upon which such a question depends, may also ascertain relations of the defendants either to the public generally, or to certain freighters, upon questions belonging peculiarly to the other case. Each party imputes, with apparent reason, to the opposing litigant, a purpose to monopolize the transportation by horse power of light freights of small bulk to and from the railroad of the defendants. With permission of the circuit judge, I quote him as having, in consultation, said of the case, that it is a war of monopolists. There is unlimited legislative power to create such a monopoly. 6 Whart. 46; 12 Harris [24 Pa. St.] 382; [Bridge Proprietors v. Hoboken Co.] 1 Wall. [68 U. S.] 145, 146; [Binghampton Bridge] 3 Wall. [70 U. S.] 81, 213; Slaughterhouse Cases (Sup. Ct. U. S. April 14, 1873) [16 Wall. (83 U. S.) 36], affirming 22 La. Ann. 546; and see 2 Gray, 1. Any exclusive profit granted by the state, either to an individual, or to a corporation, is a monopoly in the general sense of the word. In former times it was ordinarily understood as an exclusive profit for which the public received no equivalent benefit. Such a monopoly, though against public policy, and odious, can be legislatively granted in most states of the Union. But in our day, a wiser policy and a decent regard for public interests, and for public opinion, prevent any direct and avowed establishment of monopolies of this kind. Existing railroads are not monopolies in any such sense. The efficiency of the locomotive steam engine for enlarged purposes of transportation upon a fixed metalic rail was not completely established until the latter part of 1829. The public benefit then expected from a railroad was the substitution of the power of steam for that of horses, in transportation upon land between distant places. It was known that the production of this result would require immense expenditures. But the capital invested in the construction of railroads, and in their equipment, exceeded by almost countless millions, what was at first expected. Nevertheless, whenever the roads have been completed, even where the private contributors have received no remuneration for their outlay, the public benefit has been great; and where the private remuneration has been greatest, it is but small in proportion to the beneficial results to the public attained, and in prospect. These results exceed immeasurably the most sanguine former hopes. In all directions, a force equal to that of millions of the strongest horses, working by night and by day, and consuming no food, has, on both sides of the Atlan-

tic, been made available for quick transportation. The consequent increase of wealth at the ends of the lines was, in part, predicted. But the almost unforeseen production which railroads generate along their borders will soon exceed, where it may not already surpass or equal, that upon the shores of the great navigable rivers.

The ordinary modern practical use of the word "monopoly" is in the sense of an exclusive profit for the grant of which by the state, the public are intended to receive equivalent benefit. In what follows, the word, unless otherwise qualified or explained, will be so understood. It has been said that every grant of a corporate franchise or privilege may, so far as it extends, be called a monopoly. The word will not, however, be used in so vague a sense. It will be understood as applicable to those privileges only with which there is no present available competition. The legislative charters of some of the railroads companies created soon after 1829 contained express provisions of different kinds against the making, during a limited period, of a railroad by any one else within a defined area. The legislature could not afterwards, with constitutional effect, sanction the establishment of such a competing road without providing for the payment of compensation for the loss or diminution of the monopoly, after a proper ascertainment of the amount. West River Bridge Co. v. Dix, 6 How. [47 U. S.] 507; Richmond, F. & P. R. Co. v. Louisa R. Co., 13 How. [54 U. S.] 82, 83; 11 Wright [47 Pa. St.] 325–329; 2 Gray, 1, 42; The Binghampton Bridge, 3 Wall. [70 U. S.] 52; 1 Redf. R. R. (4th Ed.) § 70, pp. 257, 258. It is believed that in Pennsylvania and in most of the states no such improvident legislation is now in force. When it is not, the legislature, not having disabled itself, is under no such constitutional restraint; but may authorize the unconditional construction of new railroads, however near they may be to existing lines. The justice and wisdom of such legislation depend upon relative considerations, which may vary as increase of wealth and population diminish the area of a reasonable monopoly. The question may likewise be affected more or less by lapse of time. To authorize the construction of a new railroad very near to a rail recently laid might be manifestly unjust and impolitic. 7 Harris [19 Pa. St.] 216, 217. But when a change of local circumstances creates a public want of a neighboring line which can be profitably used, it would be anomalous that the existence of the former public highway should indefinitely prevent the construction of the new one. The loss, total or partial, of the profits of the former one from consequences of such local change was a contingency to which its owners were always liable. We see this contingency on a large scale in existing and projected railways to the Pacific. The unlimited legislative power over the sub-

ject is unquestionable. The construction of a new road without any compensation to the owners of the former one, may be continually [4] authorized with no legislative motive except the encouragement of competition. [Charles River Bridge v. Warren Bridge] 11 Pet. [36 U. S.] 544; [Minturn v. La Rue] 23 How. [64 U. S.] 437; [Turnpike Co. v. Maryland] 3 Wall. [70 U. S.] 213; 2 Redf. R. R. (4th Ed.) § 231, p. 408. See 12 C. B. (N. S.) 58–63, and Mr. Dickson's note. But, though routes the most proper for competition were legislatively established, effective competition might be long postponed through the facilities which connections by intervening railroads afford for conventional arrangements between companies intended to have been competitors, and for consolidations, merges, and so-called "amalgamations" of companies, and also for purchases or leases of a company.'s road and franchises by another company, etc. See 9 Casey. [33 Pa. St.] 281–288; 5 Wright [41 Pa. St.] 447; 3 P. F. Smith [53 Pa. St.] 9, 19, 20, 59. Also Shelford on Railways (Glen's Ed.) Introduction, 48, 49. As yet, few, if any, truly competing lines exist. Even between Philadelphia and New York, the routes are still so controlled as to preclude competition. The question of monopoly, therefore, continues to be all-important. There is, or was lately, from Paris to Bordeaux, but one railroad. The road itself is therefore in France considered in some sort a monopoly. Duverdy, Contr. de Transport. §§ 159, 162, pp. 236, 239, and Intr. p. 10. So the defendants have now the only existing railroad from Philadelphia to Pottsville, and the only connection by rail with many other great routes. The business of the road must, therefore, necessarily be, in some respects, monopolized by the defendants now; and whatever may be the future effect of possible competition, it cannot wholly deprive them of certain exclusive profits. See 1 Q. B. 584; 4 Q. B. 36, 37.

The company, as owner of the road, has thus a legitimate monopoly of the rates chargeable for the use by others of the track itself as a public highway. These rates, and nothing else, are, in a strictly proper sense, called "tolls." 4 P. F. Smith [54 Pa. St.] 315; 15 P. F. Smith [65 Pa. St.] 210; 1 Q. B. 575–577; 9 Exch. 642. If railroad companies did not furnish any motive power, and were not in any wise carriers, their only gross profits would be tolls thus properly defined, and the companies would have a monopoly of them. The earlier legislative charters of railroad companies after 1829 were not alike. Some of them indicate that companies were not expected to engage at all in the business of transportation. But most of the charters, even of that period, import that their respective companies were expected to become carriers on their own roads, though not to monopolize the business. The

---

[4] [30 Leg. Int. 149, gives "constitutionally."]

supreme court of Pennsylvania have called the former simply railroad companies, and the latter both railroad and transportation companies. The latter, as railroad companies, have "power to construct and maintain" the roads, "and to charge and receive tolls from those" who may "transport either merchandise or passengers over" them; and, as transportation companies, have authority "to transport either passengers or the property of others over their own roads, in their own cars, and with their own motive power." 4 P. F. Smith [54 Pa. St.] 312. See 12 P. F. Smith [62 Pa. St.] 228, 229. The same court has, in construing the charter of the defendants, decided that they are, by necessary implication, if not through express enactment, a transportation company, as well as a railroad company; in other words, have the twofold franchise of taking tolls, and also engaging in the business of carriers upon their own road. Id. Thus the charter, though its effect is to give a monopoly of tolls, confers no monopoly of the business of carriers. Yet the defendants have a practical monopoly of the business of carriers upon their own rails. This will require explanation.

Until 1829 horse power alone had been used upon railroads. An English railway, or tramroad, had been made by laying iron or wooden pieces in two parallel lines for the wheels, without levelling the track by cuttings or embankments more than by tue grading of a turnpike road. Most of these former railways or tramroads were private ways. But most of them were public highways. See 2 Barn. & Ald. 646; 1 Shelf. Rys. (Glen's Ed.) Introduction, pp. 27, 28. From a supposed analogy to them, the original notion as to a railroad, fitted for the use of a locomotive steam engine, was that any one of the public might, under proper conditions and regulations, use his own locomotive engine with its train upon the fixed rail, in like manner as a boat upon a canal, or a vehicle upon a turnpike, paying in like manner a fixed or a reasonable toll. The Versailles Railroad, on the left bank of the Seine, seems to have been thus used, for a time, to a limited extent (Duverdy, § 160, note, p. 237); and in England the Grand Junction Railway was, at one time, and possibly may still be, to a small extent, so used. See 4 Q. B. 20; 1 Shelf. Rys. (Glen's Ed.) p. 507. The rail may still be thus used by the engines and trains of connecting railroads paying toll or an equivalent compensation. See 4 Q. B. 19–22, 37, 38; 9 Exch. 642; 2 Q. B. 251. But except for purposes of connecting railways, this use of the track by others than the company owning the road is very little, if at all, practiced in Europe, and is in the United States almost, if not quite, unknown. 1 Redf. R. R. § 124 (4th Ed.) p. 446. This tacit exclusion of the public from participating in the business of transportation by rail, resulted from what

was almost absolute necessity. Under the present system of transportation upon a railroad, such are the dangers from the moving fires, from the intensity of the pressure of steam, and the frequent insecurity of boilers, from the great velocity of the trains, their extended length and immense weight, and the inability to deviate from the track, that a divided control of the locomotive power was very soon found inadmissible. It thus became impossible for the public generally to use locomotive engines upon the lines, and impossible to use cars of any kind independently of the most rigid supervision and regulation by the railroad companies. See 1 Shelf. Rys. (Glen's Ed.) Introduction, pp. 29, 30. If dangerous interference with the police of the roads could have been avoided, the subjection was greater than could be submitted to by independent carriers. Through this relative necessity, the business of carriers by rail was everywhere monopolized by railroad companies. The origin of the enlarged monopoly was thus explained in a very instructive argument in 1842, by Mr. Martin, afterwards a baron of the exchequer. 10 Mees. & W. 412, 413. It had before been, and was afterwards, judicially so explained by Lord Denman. 1 Q. B. 558. 580; 4 Q. B. 18. The companies were indirectly fortified in the monopoly through their exclusive or preferential use of their depots or stations, and their warehouses, platforms, etc., and the immediate approaches or outlets. The appropriation of some of these preferential facilities to their own exclusive benefit, has not been judicially considered wrongful. Whether it may not be such as to encroach in some degree on rights of the public, is a question which there is no occasion to consider now, because the companies would, independently of such advantages, have a practical present monopoly of the business of carriers upon the rails. Lord Denman said that "the supposition of a free competition of carriers on the same railway, is practically little less than absurd." and that "if all difficulties were removed as to the stations, warehouses, landing places and approaches, and all these were supposed as much laid open to the public as the railway itself, the very nature of the mode of conveyance forbids a free competition of rival carriers." 1 Q. B. 579. "It would," he added, "be no answer to say that, by law, the railway is a highway, that all the world may carry goods and passengers on it, that it is an accident that the company alone monopolize all the trade, and that their monopoly may cease to-morrow." 1 Q. B. 584. See, also, 5 C. B. (N. S.) 351.

A recent observation of the supreme court of Illinois, that a railroad company is chartered solely for the purpose of exercising the functions and performing the duties of a common carrier (Chicago & A. R. Co. v. People [Feb. 22, 1873] 5 Chi. Leg. News, 266, 267; Phil. Leg. Gaz. March 14, 1873), is thus, to practical intents true. If tolls, distinctively so

called, were alone in question, and if the rates of toll were neither prescribed nor limited by the legislature, the companies could not charge unreasonable rates. But this proposition is practically merged in the question of the charges which the companies may make as common carriers. The general railroad law of Pennsylvania gives to the respective companies to which it applies exclusive control of the motive power; and enables them to include in a single charge both tolls and a compensation for the use of the motive power when the cars to be transported are owned or furnished by others. This enactment does not, where the company themselves are carriers, regulate the charge of the freight money. Act 19th Feb. 1849, § 18. This general law does not apply to the present defendants. With reference to their charter, the supreme court of the state has discriminated further, distinguishing tolls defined strictly from charges for the use of the locomotive power, and distinguishing both of those charges from charges of passenger money and of freight money. 4 P. F. Smith [54 Pa. St.] 314, 315; 15 P. F. Smith [65 Pa. St.] 210; 12 P. F. Smith [62 Pa. St.] 228, 229.

Every charge by a railroad company, as a carrier, upon the line of the road itself, is thus composed of three values. One of them is the amount which would be chargeable simply as toll, if the company neither furnished motive power nor were carriers. Another is the additional charge which they might make for the use of the motive power if they were not carriers. The other may be distinctively called freight money. It is the additional amount which is chargeable because they are the carriers. These three values may be reducible to two by including the charge for use of the motive power under the head of toll. The two values will then be those of toll and freight money. American, French, and English legislation contains careful provisions for analyzing the sum charged in tariffs, or in reports made annually, under these two heads, though not under precisely these names. The statistics of the analysis, of which the memorials are thus preserved, may be useful, not only in defining present relations between the companies and the public, but also in the contingency of such future improvement in the method of transportation as may open it to the public.

In external relations of the companies a single charge alone occurs. See 1 Q. B. 575, 576. It has, perhaps, oftener been called a toll than by any other name. The designation, as we have seen, is not precisely accurate. But it would seem at first view to be of little or no importance whether the charge were called a toll, and was understood as including the value of freight money, or were called freight money or fare, and was understood as including the toll. The verbal distinction has consequently been disregarded more or less everywhere, and occasionally even in Pennsylvania, where it has been best

explained. In England, confusion and uncertainty have arisen from a lax use of the word "tolls," in both legislative and judicial phraseology. It is to be regretted that the courts have not confined their application of the word "tolls" to charges for simple passage over the road. But, as we have already seen, such tolls are not now, in practice, chargeable except for the reciprocal use of connecting railroads; and even as to them, a conventional commutation is probably made wherever it is authorized by the respective charters. The objection to extending the application of the word "toll" with undue latitude is, that it tends to exaggerate the mental conception of a railroad company's monopoly. Of tolls, properly so called, the monopoly is an essential right of the company as proprietor of the road. The monopoly of the carrying business originates, on the contrary, in the relative necessity which has been described. In the former monopoly, the proprietary right is moral as well as legal. In the latter monopoly, there is neither proprietary nor essential moral right; and the legal right is coextensive only with the necessity in which it originates. The extension of the claim of moral right beyond its just limit in this respect may have been the cause of otherwise inexplicable renewals of contestations by English railroad companies on points already litigated and judicially decided against them, and of the frequent new phases of the argument of old questions. It may be suggested that this reasoning is too analytical, that the service of a railroad company as carrier is a single one, that the pecuniary consideration for it includes inseparably the profit in which the monopoly is rightful, and that it cannot be less rightful merely because an admitted necessity enlarges the service performed, and proportionally enlarges the pecuniary consideration. The suggestions might, perhaps, prevail if transportation upon the line of rails were alone in question. But the present controversy concerns accessorial carriage by horse power off the line of the railroad. Conceding the rightfulness of such accessorial business beyond the rails, there can be no reason that it should be monopolized. It is conducted where tolls cannot be taken, and where the steam power is not used. See 5 C. B. (N. S.) 362, 363, 355, 669, 679. In England, Chief Justice Erle stood almost alone in the opinion that a railroad company, in recompense for their outlay and of the fulfilment of the purpose of their incorporation, had both a legal and a moral right of monopolizing, not only the carriage of goods upon the line of the road itself, but also the accessorial carriage performable off the line with horse power. To this opinion, though always a dissenting one, he adhered with tenacity from 1861 to 1869. He had expressed it at nisi prius in 1854, when a verdict conformable to it, found under his direction, was set aside. 9 Exch. 559. See 11 Exch. 742. It was op-

posed to prior decisions; but his dissent from them caused, in subsequent cases, a revision of the subject in the exchequer chamber and in the house of lords, in which tribunals the prior decisions could not prevent the consideration of the question upon original grounds. On the fullest consideration his opinion was definitely rejected. 16 C. B. (N. S.) 137, affirming 14 C. B. (N. S.) 1, and acc. with 5 C. B. (N. S.) 336; L. R. 4 H. L. 226, affirming 3 Hurl. & C. 800.

Here, however, the complainants object earnestly, not only to the monopoly of such accessorial business by the defendants, but even to their engaging or participating in the business at all. The consideration of this objection may be prefaced by another inquiry, which has been suggested in the argument. It is whether the defendants can, as carriers by rail, transport goods which are destined beyond the termination of their own road. This inquiry is not whether the responsibility of such carriers by rail continues until the goods reach the ulterior destination. It is not an inquiry what engagements may be made, or implied, as to putting the goods in the due course of transmission to such destination. The inquiry is whether such carriers must refuse to transport goods on their own route merely because they are not to be carried farther, and whether they may not, on the contrary, solicit such custom in order to increase the profitableness of their business. From time immemorial, the service of a common carrier to the public has included the transportation of matter destined beyond his route, and has included the affording of necessary and proper facilities for the ulterior transmission. Great public inconvenience would result if railroad companies could not afford such facilities in this respect as other carriers. The act of congress of 15th of June, 1866, purports to authorize every railroad company in the United States whose road is operated by steam to carry, upon and over the road, freight and property on their way from any state to another state, and to receive compensation therefor, and to connect with roads of other states so as to form continuous lines for the transportation of the same to the place of destination. This act provides that it shall not be construed to authorize any railroad company to make a new road, or connection with any other road, without authority from the state in which such railroad or connection may be proposed. The Pennsylvania statutes prior to 1866, which were fully reviewed in the cases reported in 3 P. F. Smith [53 Pa. St.] 10, 20, and 62, and the subsequent acts of the 4th of April, 1868, 17th of February, 1870, and 26th of April, 1870, have established an extended system of direct and indirect connection of railroads within and without the state, and authorized their merger, consolidation, and lease for the further extension of continuous routes. Whether these laws apply directly

to the question or not, their purposes would be materially frustrated if the companies could not take freights with unlimited ulterior destinations. But in the absence of all such legislation (and without any special reference to the enactment of 3d of April, 1862, which, read in connection with the act of 5th of April, 1859, authorizes the defendants to contract for transporting freights to and from points beyond their line), the question would be attended with no difficulty. It has been judicially conceded, assumed, or decided, in Pennsylvania, in many of the other states, and in England, that a railroad company may, as a carrier, receive goods which are to be transported beyond the end of the company's own route, whether the destination is within or without the state or country, or is beyond seas. 6 Harris [18 Pa. St.] 224; 9 Wright [45 Pa. St.] 208; 10 Wright [46 Pa. St.] 211; 11 Wright [47 Pa. St.] 338; 4 P. F. Smith [54 Pa. St.] 77, 83; 18 P. F. Smith [68 Pa. St.] 277; 11 P. F. Smith [61 Pa. St.] 85; 7 H. L. Cas. 194; 12 C. B. (N. S.) 63; 10 C. B. (N. S.) 675; 2 Hurl. & N. 709; L. R. 1 C. P. 336; L. R. 1 Exch. 147, 148; 8 Mees. & W. 427; 2 Redf. R. R. (4th Ed.) §§ 180, 181, pp. 112, 123. This question has been considered more fully than would otherwise have been thought necessary in consequence of a remark of Chief Justice Redfield, upon a case in Connecticut (22 Conn. 502), that, if the matter were altogether new, there might be some doubt. Redf. R. R. ubi supra.

The question, if it can be called one, having been disposed of, we may consider the objection that the defendants cannot, as carriers, use horse power for accessorial business performed off the rails in collecting freights at the doors of consignors and in making deliveries at the doors of consignees. We have seen that the defendants cannot monopolize the business. Whether they can participate in it is the very different present question. The question is not novel except in the physicial proportions of the subjects of it. The scale of all the business of a railroad company is thus enlarged. The passenger car in the United States, if not in Europe, is the improved and enlarged substitute for the stage coach or diligence of other days. In the freight trains, whose burden car is the substitute for the former great wagon, loads are now measured by the ton. The drayage and slow cartage to and from the rails are facilitated by turnouts on rails, and by lateral railways. There is, perhaps, no proportional change greater than that in the measure of such light freights of small bulk as are conveniently transportable with speed, and are usually carried in the passenger trains. In the United States, these freights were formerly and are still called express matter. Although the demand for the labor of horses in Europe and in America continually increases, their aggregate strength is now less than sufficient for

those purposes, incidental or auxiliary to transportation, for which the strength of men formerly sufficed. Portable articles were formerly understood as those which could be conveniently carried by hand, or, at most, in a push cart or wheelbarrow. Of their increase in bulk, we may form some estimate from the former contract of 1866 between the present litigants allotting whole cars, and fractional parts of cars, for such matter, and allowing seven cubic feet for the capacity of a strong box or safe. Of the increase in weight, an estimate may be conceived from English statutes allowing additional proportionate amounts of charge for the transportation of light matter of different kinds, describing it as of the respective weights of 100 pounds and 500 pounds. Independently of such enlargement in bulk and weight, the number of parcels or articles of this kind so accumulates for transportation by rail that they could not be collected and carried to railway depots and stations, or properly carried from them for individual delivery, without the use of suitable vehicles drawn by horses. These vehicles, comparatively light with certain relations, are with others comparatively heavy. They are not less necessarily incidental and auxiliary to the transportation of express matter by rail than the wheelbarrow, with its porter, was formerly the incident or auxiliary of transportation by wagon or stage coach. See 5 Durn. & E. [Term R.] 396, 397. For the transportation by rail of express matter, and its incidental collection and delivery, economical and profitable arrangements have not been as yet systematized. The reason appears to be that the profits from the carriage of such matter on the rails are very small as compared with those of the accessorial business in which horse power is used. An allegation of the complainants' bill, supported by an affidavit, is that this accessorial business, which they have heretofore conducted, is "enormously valuable." But from the statistics in reports of railroad companies to their stockholders, their own profits, under this head, seem to bear a very small proportion to those derived from carrying heavy freights. There is no allegation that the charges to the public of those heretofore engaged in the express business have been reasonable. As the railroad companies cannot themselves monopolize this accessorial business, it would be prejudicial to the public interest that they should be excluded from participating in it. Their participation may be the only means of preventing outside combinations to maintain high charges. If direct participation were impossible, the inducements to encourage outside monopolies would be dangerous to the public interest. Of this and analogous dangers, many examples on both sides of the Atlantic are found in books of reports. But the number of such examples may be small in proportion to that of cases unknown.

The first argument in support of the objection is that the legislative charters of railroad companies are construed strictly against the companies, and that their franchise of common carriers on the line of a railroad therefore cannot be extended by implication so as to include any transportation which is not upon the rails. The charters of railroad and other public improvement companies are judicially designated as contracts between the respective companies and the state or the public. The expression "contract," or "bargain," after having been thus applied by Lords Ellenborough, Eldon, and Tenterden, and by other eminent judges of England, was judicially criticized there, because it might, unless explained, be understood as importing that the charters were executory contracts of the companies enforceable by mandamus. These companies are under no compulsory obligation to begin the projected improvements, or to complete them if begun. 1 El. & Bl. 847, 858; 1 Redf. R. R. (4th Ed.) § 152, note, pp. 630, 632–635. After their completion, moreover, the companies have an option to omit or defer, and to intermit and resume the exercise of corporate functions of certain kinds. Nevertheless the charters are properly called contracts. They are at first conditional or executory, and may afterwards become executed contracts. The English criticism admits this. Compare 1 Mylne & K. 162 with 2 Younge & C. Ex. 618, and 1 El. & Bl. 868, 869. But if it did not, it could have no effect in the United States, except, perhaps, to qualify the use of the word "contract," not inconsistently with its application originally intended. An executed contract has its obligatory effect. The observation is important, because the constitution provides that no state shall pass any law impairing the obligation of contracts. This prohibition extends to all contracts, executed or executory, whether between individuals or between a state and individuals. The supreme court, adopting the suggestion of Blackstone (2 Comm. 443) that an executed contract differs nothing from a grant, have considered a legislative grant a contract on the part of the state. Fletcher v. Peck, 6 Cranch [10 U. S.] 136, 137. All state laws incorporating private associations for public purposes are thus legislative grants, and as such are contracts [Dartmouth College v. Woodward] 4 Wheat. |17 U. S.] 630–650; [Green v. Biddle] 8 Wheat. [21 U. S.] 92; [Providence Bank v. Billings] 4 Pet. [29 U. S.] 560; [Branch Bank v. Skelly] 1 Black. [66 U. S.] 436; [Von Hoffman v. City of Quincy] 4 Wall. [71 U. S.] 549, 550; [R. R. Co. v. McClure] 10 Wall. [77 U. S.] 515; [Home v. Rouse] 8 Wall. [75 U. S.] 436, 437; [Bridge Proprietors v. Hoboken Co.] 1 Wall. [68 U. S.] 145, 146; [Binghampton Bridge] 3 Wall. [70 U. S.] 73; [Pennsylvania College Cases] 13 Wall. [80 U. S.] 212–214, 218, 266–268. Public interests may afterwards require legislative abrogation, resumption, alteration, or transfer of the corporate

franchise. But, unless the original acts of incorporation have reserved the right of such repeal or change, it cannot without the consent of the respective companies be effected constitutionally, except through laws providing for the payment of pecuniary compensation after proper judicial ascertainment of the amount. [West River Bridge v. Dix] 6 How. [47 U. S.] 507; [Richmond R. R. Co. v. Louisa R. R. Co.] 13 How. [54 U. S.] 82, 83; [Piqua Branch of State Bank v. Jacob Knop] 16 How. [57 U. S.] 369; 11 Wright [47 Pa. St.] 325, 329; 2 Gray, 1, 42, and other cases above cited; also, 1 Redf. R. R. (4th Ed.) § 70, pp. 257, 258.

These are now constitutional truisms. Not less trite is the remark, that in England, where legislative omnipotence prevents corporate franchises from being thus irrevocable, yet however improvidently' they may have been granted, moral considerations generally suffice to protect them against legislative encroachment without compensation. Therefore, on both sides of the Atlantic, there is like moral reason for a strict construction of such charters, though the legal reasons may be more obligatory in the United States. The reasons of policy or justice ordinarily given for such a construction are that the administration of a franchise of great public interest by a private person or private association, is against common right, and that the charters are penned by or for the private persons to whom they are granted. Chief Justice Redfield observes truly that there is no necessity that the public functions in question should be confined to aggregate corporations. He says that the same franchises and immunities might be conferred by the legislature upon any private person, and that whoever was the grantee, whether a natural person or a corporation, the same rights, duties, and liabilities would result from the grant. 1 Redf. R. R. (4th Ed.) § 17, p. 52, note 4. It may be added, however, that the franchises might exist without the immunities. The universal practice, Chief Justice Redfield says, confines the public functions to corporations aggregate. Id. It adds force to the reasons for a strict construction of the charters that they in effect exempt the members of these private associations from individual responsibility. The rule of strict construction generally prevents the implication of any corporate privilege not expressly granted. The acts incorporating the Chesapeake and Delaware Canal Company furnish an example. They authorize the charge of certain tolls for commodities in vessels passing through the canal, and for empty vessels except such as return empty after payment of a certain toll. As no power is given to take toll from passengers, or from a vessel on account of passengers on board, a vessel with passengers can, as to them, navigate this canal free of toll. [Perrine v. Chesapeake & D. Canal Co.] 9 How. [50 U. S.] 172. So the Stowbridge canal in England was formed upon two levels which were connected by locks. The proprietors of the canal were incorporated by an act authorizing them to take tolls for articles passing through any one or more of the locks. The English decision (2 Barn. & Adol 792), that this gave no right to toll from those who navigated one of the levels, without passing through a lock, has been generally approved in the United States. [Charles River Bridge v. Warren Bridge] 11 Pet. [36 U. S.] 544, and cases next below cited. The rule of strict construction applies likewise where the words used would otherwise admit of different meanings, one of which would abrogate, restrict, or abridge independent rights, profits, or facilities of the public. Where the words are thus ambiguous, the meaning most favorable to the interest of the public and most adverse to that of the company should be adopted, because the company "in bargaining with the public" ought to take care to express distinctly what is intended. See the books above cited and 11 East, 685; [Dubuque & P. R. Co. v. Litchfield] 23 How. [64 U. S.] 88; 2 Man. & G. 164, 165; [Rice v. Minnesota & N. W. R. Co.] 1 Black [66 U. S.] 380; 2 Jones [12 Pa. St.] 320, 321; 7 Harris [19 Pa. St.] 218; 3 Casey [27 Pa. St.] 339, 351; [Mills v. St. Clair Co.] 8 How. [49 U. S.] 581; 2 P. F. Smith [52 Pa. St.] 516, 517; 9 Harris [59 Pa. St.] 22; 4 Bing. 452, 453; 1 Q. B. 588; 3 De Gex, F. & J. 361. A peculiar case, often cited, by mistake, as a leading one under this head, was that of the Glamorganshire Canal Company. The canal obtained its principal supply of water from the river Taaffe. Mills and iron works employing a considerable part of the waters of that river, and entirely dependent upon them, had been established before the incorporation of the company. The act of incorporation reserved or appropriated to one of the proprietors, whose rights were afterwards acquired by Mr. Blakemore, the surplus water not required for the use of the canal. The act authorized the canal company to make all such works, etc., as they should think proper for completing, maintaining, improving, and using the canal and other works. The capital which the company were authorized to raise was £90,000; and it was provided that if their annual profit should exceed eight per cent. on that amount, the tolls were to be reduced. The company having proceeded to construct the canal and works, and having expended the £90,000, found that it would require a further sum to complete them, and to make a desired extension of the canal; whereupon a supplementary enactment authorized the extension and completion; and enabled the company to raise an additional £10,000 for these purposes, provided that everything should be finished within a prescribed time. This was done. Afterwards, and after the expiration of the time limited, the company improved the canal, and increased the supply

of water for it, by making a new steam engine, and a reservoir; and, at a subsequent period, made a further improvement by widening and deepening the canal. These improvements diminished the supply of water for Blakemore's mills and works. It was decided at law and in equity, and by the house of lords, that the act of incorporation had been an apportionment of the water power between the company and Blakemore, and therefore that after the canal was finally completed the company had no right to enlarge or alter it to his injury. 1 Mylne & K. 154, 162, 167, 170; 3 Younge & J. 60; 1 Clark & F. 262; 1 Mylne & K. 171–176–178; 2 C. Man. & R. 133. In this case, Lord Eldon, 1 Mylne & K. 162, made the remark which has been criticized as above. He made in the same case another observation which has also been criticized. It was, that, if individuals come to the legislature, and apply for a canal or a railway act, and the legislature, on being satisfied that the railway or canal can be made at an expense of, say £100,000, forms them into a company with power to raise money to that amount, the authority is given upon a representation by them, and in full confidence by the legislature, that such a sum will enable them to complete the work; and, if they find afterwards that £100,000 is not enough, the court of chancery, Lord Eldon thought, would find it very difficult to allow them to proceed with the work until they had obtained further legislative authority. Id. 164. This observation should not be understood with an unrestricted application. Upon the question of encroachment on Blakemore's water power, the limit of the authorized amount of investment was a measure of the company's privilege; and Lord Eldon's observation applies wherever a like principle is in question. But an unqualified application of his words to other cases cannot be made. It might, in many cases, promote unwarrantable interference with the execution of authorities legislatively conferred. See 3 Mylne & C. 422–426; 1 Redf. R. R. (4th Ed.) § 210, pp. 332–334.

It is contended on the part of the complainants that, as in the cases of the Chesapeake and Delaware canal, and the Stowbridge canal, so here, the profit of the defendants cannot be derived from any business not within the direct and express provisions of their charter. But the reasons for thus applying the rule of strict construction are insufficient. The present question is, on this point, neither that of monopoly in the defendants, nor that of abrogation, restriction, or abridgment of any rights which the public would otherwise have. A different or qualified, if not an opposite, rule of construction applies to questions of the capacity of the companies to improve the means and increase the facilities of transportation, or otherwise to enlarge the sources, or expand the development, of legitimate profits derivable from varied uses of the corporate franchises. Under the latter head, useful incidental or auxiliary corporate functions may be attributable by necessary or fair implication. 4 P. F. Smith [54 Pa. St.] 316; 3 Casey [27 Pa. St.] 351, 352. Legislative charters of improvement companies may, as to such relations, even be construed liberally. 7 Barn. & C. 731. We have already seen this exemplified in the transportation of goods having ulterior destinations. Another example may be found in the charter of the same Glamorganshire Canal Company, which has already been mentioned as exemplifying, in another case, the application of the rule of strict construction. An account of the annual profits of that company was from time to time taken in a manner prescribed by the charter, in order to ascertain whether they amounted to eight per cent. of the capital, in which case the tolls were to be reduced, as has already been stated. It was twice decided by the court of king's bench that, in this account, the company were to be credited for their expenditures in making the same improvements already mentioned as causing encroachment on Blakemore's water power. These were the steam engine, the reservoir, and the deepening and widening of the canal. The question thus arose between the company and freighters on the canal, who were interested in obtaining the reduction of tolls; and, in one of the cases, the promoter of the controversy was the same party, Blakemore, but in the different relation of a freighter. The credits were, in each case, allowed as the cost of improvements by the company, which were, in this relation, and with reference to public interests generally, authorized by the charter. In other words, the improvements were properly made as against all the world except Mr. Blakemore as the owner of his apportioned water power. On the question of expense attending the supporting, maintaining, and conveniently using the navigation, the court, in language already quoted, said that the words of the charter "ought to receive a liberal construction." 12 East, 157; 7 Barn. & C. 722, 731. These decisions were approved in the cases decided, on the same legislative words, in favor of Blakemore as owner of the water power. 1 Mylne & K. 170, 171; 2 Cromp. M. & R. 142. The rule of strict construction therefore does not apply without qualifications which are overlooked in the argument for the complainants.

Before stating another of the arguments in support of the complainants' objection, an observation of some importance in the case becomes necessary. It is that a railroad company having a capacity to act as a common carrier is not obliged to do so, even upon the line of its rails; and if it engages in the business at all, may do so generally, or only as to freights of certain kinds, light or heavy, small or large, or for only a part of the line of rails. 4 Exch. 373, 374; 7 Exch. 712; 6 Hurl. & N. 654; 2 Shelf. Rys. (Glen's

Ed.) 613, 614; 2 Redf. R. R. (4th Ed.) § 183, pp. 121, 132; and see 1 El. & Bl. 858. So the company may have an option whether to engage or not in the accessorial or incidental carriage, off the rails, by horse power, to and from the depots and stations, or the offices of reception and delivery; that is to say, from the doors of consignors, and to the doors of consignees. See L. R. 6 C. P. 561, and other cases. Now companies which have made no public profession or offer to engage in the accessorial business of collecting or delivering, are not requirable to receive any freights except at their own stations, depots, or offices of reception, or to make any delivery beyond them. [Richardson v. Goddard] 23 How. [64 U. S.] 39; [The Eddy] 5 Wall. [72 U. S.] 495; 6 Casey [30 Pa. St.] 247; 10 P. F. Smith [60 Pa. St.] 114, 115; 19 P. F. Smith [69 Pa. St.] 377; 1 Rawle, 203; 10 Mees. & W. 420, 421; L. R. 3 Exch. 189; 4 Durn. & E. [Term R.] 581; 5 Durn. & E. [Term R.] 395, 397, 400; 8 Taunt. 443; 3 Man. & G. 687–690; M. S. cited, 15 Vin. Abr. p. 348, pl. 25; 10 Metc. [Mass.] 472; 1 Gray, 203; 16 Gray, 134; 2 Redf. R. R. (4th Ed.) § 175, pp. 60–64. But a company which does engage in such accessorial business, must in like manner as other carriers by land, make deliveries at the doors of all consignees who do not dispense with such delivery.

The argument for the complainants which may now be stated, is a mere assumption that, because a company which has not made any such engagement to the public, is excused from delivering beyond the precinct of the railway, therefore such an engagement cannot be warranted by the company's charter. The assumption is of the very point or proposition which was to be demonstrated. In most of the cases heretofore cited as denying to the defendants a monopoly of this accessorial business, and in most or all of the cases hereafter mentioned upon questions of the defendants' charges for the accessorial service, the lawfulness of their participating in such business was impliedly, if not expressly, recognized. The objection seems, therefore, to have no support of reason or authority. But a railroad company, so far as it actually or professedly engages, either generally or specially, in the business of a common carrier, is under at least the same obligations to the public as an individual common carrier upon a route of any other kind. [Hannibal & St. J. R. Co. v. Swift] 12 Wall. [79 U. S.] 270. To the extent of the means of convenient transportation, which are in the course of a common carrier's business available, he cannot refuse to receive goods for transportation which are seasonably offered; and he is bound to serve all persons impartially.

A railroad company, as it cannot encounter competition upon the rails, may have consequent inseparable advantages in conducting the accessorial business with horse power. This gives peculiar force to the reasons that the company should be restrained in the latter business from assuming preferential facilities to itself, or extending them to any one else. 12 Harris [24 Pa. St.] 378; L. R. 4 H. L. 237, 1 Best & S. 162, and other cases cited hereafter. Railroad companies have in this respect an immense power whose abuse cannot easily be prevented. On all questions under this head, therefore, to guard against the danger of encroachment on rights of the public, the charters of the companies are construed strictly against themselves and liberally in favor of the public. 7 Man. & G. 288; and see 6 El. & Bl. 108, 109. This applicability of the rule of strict construction to such questions of possible encroachment is obviously consistent with its inapplicability to the converse question of the right of the companies to compete fairly with any one of the public in the accessorial business. The general relations of the defendants to the public include those to the complainants considered as one of the public. Such relations having been defined, we may, before applying the principles which have been stated, consider the relations of the complainants to the public and to the defendants. The complainants appear to have been engaged in the business of express carriers very extensively, and perhaps without always encountering such free competition as to promote the interests of the public. Express carriers intervene between a principal carrier and persons usually unknown to him whom they represent at each end of his line to transportation. Those whom they represent at the place of departure may be called transmitters to distinguish them from consignors, known as such to the principal carriers. The parties who are to receive the goods at the place of destination may, in order to distinguish them from consignees known as such to him, be called destinees.[5] Middlemen are always at hand everywhere to execute any incidental function of transportation which a principal carrier may omit to perform. They may have more or less independent relations to the principal carrier. Before and since the use of locomotive steam power upon land, middlemen have acted variously in different countries, not merely as agents of transmitters and of destinees, but also as, in certain respects, carriers or subcarriers between them. There are neither in Europe nor in this country middlemen whose relations, public and private, are, in all respects, such as the complainants define their own to be. Their former contracts with the defendants indicate, however, that what they now claim as independent rights were, in part at least, stipulated for by them as privileges to be en-

---

[5] The word "destinatary" would be objectionable because in France "destinataire" has a more general application. See Duverdy, § 3, p. 20.

CAMBLOS (Case No. 2,331)

joyed only at sufferance or until determined by notice.

When the rights and obligations of those here called express carriers are properly defined, their legal relations will appear to be, in general, very similar to those of certain European middlemen, though, in some special respects, perhaps different from any in Europe. Differences may arise from local usages of traffic and other commercial intercourse. The French law, differing in one respect from our own, and from that of England, has always obliged all railroad companies acting as carriers in any wise however, to make deliveries at the doors of all known consignees who do not dispense with such delivery. Duverdy, §§ 224, 227, 228, pp. 321, 325, 326. But the French companies cannot insist upon performing such service for consignees who, dispensing with it, choose to receive the freights at the railway depot or station, or delivery office (Id. §§ 225, 226, 229, pp. 332, 323, 328); and those companies are under no obligation to collect freights and consignments. A French middleman who, as representing transmitters, carries goods to a railway reception office, depot, or station, often represents also destinees, in which case, he, on their behalf, or as being himself both consignor and consignee, dispenses at the other end of the line with all service of the company by horse power, and renders it himself, making the ultimate deliveries. In England, so long as the railroad companies were carriers by rail only, middlemen conducted the auxiliary business on a large scale, not limiting it exclusively to light small matter. English railroad companies very soon became desirous of participating in the profits of such business, or of appropriating all the profits of it to themselves, or to those whom, with or without a profitable consideration, they favored. At first they seem to have either farmed the business out, or to have conducted it through contractors or otherwise favored subcarriers. Afterwards, the companies, or one or more of them, engaged in the business themselves. In each of these progressive stages, litigations occurred from encroachments by the companies upon the rights of middlemen desirous of maintaining, as carriers, independent relations with transmitters and destinees. Chief Justice Erle called such middlemen intercepting carriers. The designation was inapplicable because they were engaged in a useful business which had been legitimately established before the railroad companies were directly engaged in it, and because it was, after they engaged in it, a business proper for the most unrestricted competition. The defendants, and, it is believed, most of the railroad companies in the United States, have heretofore either farmed out to express companies the business of collecting and delivering the light and small freights transported in fast lines, or have conducted it through

such companies, as contractors. All such conventional relations of either kind between the complainants and the defendants terminated, as their contracts had provided, when sixty days from the time of the notices expired.

The defendants now both carry such freights by rail, and use horse power of their own to collect and deliver them, as they were formerly collected and delivered by the complainants. The defendants profess that they have no purpose to exclude anybody from the business of rendering like service by horse power to the public for profit; and seem particularly to disclaim the intention to hinder the complainants from participating in such business. The defendants ought not to be impeded in the execution of their purpose, if it really is to reduce charges to the public by promoting competition, or if it is to participate fairly in the profit of the use of the accessorial horse power without unreasonable exaction from the public.

The subjects of dispute may be classed under two heads. The first includes the complainants' demand of certain facilities and accommodations in their express business. The second includes the alleged pecuniary overcharges, to which they object. The arguments on their behalf under the second head are generally well founded; but are, in a great measure, fatal to their own pretensions under the first head. It has already been said that they have no present conventional rights. It might, therefore, seem unnecessary to inquire whether, under former conventional arrangements, they had a covert monopoly or any undue facilities or advantages. Indeed, the complainants are not understood as now insisting upon preferential facilities to themselves in right of past conventional relations. That contention would be palpably absurd. But they do insist upon receiving facilities and accommodations of great expansion, which they certainly endeavor to define by the standard of the former practical relations. The most favorable way of stating their pretensions is that they claim facilities and accommodations proportional to the actual and prospective expansion of their own express business. If such facilities and accommodations are neither preferential to themselves, nor inconvenient to others, the demand may be reasonable. But if they are exclusive or preferential, their allowance would promote, if not perpetuate, monopoly. The question heretofore considered has been, when they were preferential, not whether a railroad company must, but whether it can, allow them. On this latter point, Cockburn, C. J., said, that, "if an arrangement were made by a railway company, whereby persons bringing a larger amount of traffic to the railway should have their goods carried on more favorable terms than those bringing a less quantity, although the court might uphold such an arrangement

as an ordinary incident of commercial economy, provided the same advantage were extended to all persons under like circumstances, yet it would surely insist on the latter condition, and would interfere in the case of any special agreement by which the company had secured to a particular individual the benefit of such an arrangement to the exclusion of others." 5 C. B. (N. S.) 354; and see 1 Best & S. 160, the observation upon 6 C. B. (N. S.) 639. Such is the limit of the corporate power. The contention that the company is under a compulsory obligation to allow such a preferential advantage is novel. These remarks are applicable to the question whether the complainants can reasonably require to have, in a passenger train, a car furnished by themselves. The question depends upon relative considerations, in which the convenience of others, not less than of themselves, must be consulted with a view to arrangements of the trains, and to accommodations in and out of depots and stations, etc.

The complainants cannot reasonably require any space to be set apart for their exclusive use in a car of the defendants in such a train. If the space be vacant, those who first bring goods ought to have it. If it be filled, the goods in it cannot be displaced. The requirement, as of right, for an agent in charge of the complainants' express matter, of any other accommodation or place in the trains than that of an ordinary passenger under the control of the company's police of the road, seems to be quite unreasonable. More unreasonable is the pretension that he can, as a passenger, carry, without other payment than as for baggage, a trunk which contains express matter. The complaint that the defendants do not allow to express carriers the use of the platforms and landings, etc., at the depots and stations, appears to be connected with a dispute of the right of the defendants to establish offices and warerooms of reception and delivery away from depots or stations. The question implies that the offices must be conveniently situated for the accommodation of the public as well as for the purposes useful to the defendants. The question, thus qualified, seems to admit of no answer but an affirmative one. It has been so decided in France (Duverdy, § 229, p. 328), and has never been disputed in England, where such offices are in many cities and principal towns. See 6 El. & Bl. 110; 11 C. B. (N. S.) 787. Professor Parsons intimates that most carriers have a receiving office or depot, or station, or place of reception of some name. 1 Pars. Cont. 653, bk. 3, c. 12, S. S. Indeed, even express carriers have, it is believed, places of reception and delivery distinct and more or less distant from the places where their other business is transacted. These are not matters with which a judicial tribunal can meddle, unless an evil motive and effect is justly attributable.

The argument for the complainants, citing

12 Harris [24 Pa. St.] 378, and 57 Me. 188. admits (though perhaps without an intention to concede) that the defendants cannot allow to the complainants, or to any other express carrier, facilities or accommodations amounting directly or indirectly to a monopoly or partial monopoly. A leading English decision (10 Mees. & W. 399, pl. ult. of headnote), cited with approval in the case in 12 Harris [24 Pa. St.] shows that no advantage, however small, could be preferentially allowed by the defendants to any such party as the complainants. Thus the defendants may appoint a reasonable hour of the day or night for the closing of their office for the reception of freight. But they cannot receive for themselves as carriers, or for the complainants, or for any other favored party, at a later hour. 6 C. B. (N. S.) 639; 12 C. B. (N. S.) 758; 1 Best. & S. 112. In a case of this kind in England the peculiar views of Erle, C. J., caused, at one time, a division of opinion upon the point. L. R. 1 C. P. 588. But the rule of decision was afterwards re-established. L. R. 5 C. P. 194. If no such hour has been appointed, the complainants cannot require that any freight be received which is not brought a sufficient time before the departure of the train to allow convenient reception, loading, booking, way-billing, etc.; and cannot require that any parts of the latter business be transacted by their own agents unless agents of other middlemen are allowed the privilege. Other examples might be cited. See 11 C. B. (N. S.) 787, and other books. The complainants do not allege their willingness to submit themselves, in such respects, to reasonable regulations of their business, to which public interests require their subjection. Their footing in equity is, therefore, very insecure, even where they might otherwise, on certain other points, be entitled to relief. They certainly are themselves endeavoring to encroach upon rights of the public; and any partial success of their present effort might prevent equal competition, or embarrass the defendants in transacting proper business at their depots or stations, or at the approaches or outlets, or at the offices of delivery and reception.

The remaining questions are those of alleged overcharges by the defendants. If we recur to the analysis of the charge formerly made by the defendants for carriage only by rail, it will be understood that their present charge, being a single aggregate sum, includes an additional amount or elementary value. It is the amount of compensation for the additional service which they offer to render by horse power in collecting and delivering the freights. It is to be regretted that they did not, after experience of the injurious mistakes of English railroad companies, publish the definite amounts of the intended additional charge. This would have given a fair opportunity of competition by any parties willing to serve the public for less, or for the same rates, and have prevent-

ed the possibility of any continued monopoly of the business by the complainants, or over-charge by them, or by any one else. It is also to be regretted that the defendants did not, when requested, make known to the complainants the particulars of any intended new tariff of charges. Whether the complainants were, of absolute legal right, entitled to the information thus asked, or whether they are entitled to the disclosure asked under this head of their bill, will not be considered now, as the question may possibly arise hereafter in the cause, upon an exception to the answer, or in some other form. The defendants, in effect, claim a right of making the additional charge to those who reject or dispense with the additional service. There is no difference between such a claim of right, and a refusal to deduct the amount from the aggregate sum which includes it. The latter is the form of the question in which it here arises. It so arose in England. The defendants, in support of this arbitrary pretension, rely, not upon any precedent of judicial authority, but wholly upon the reasoning of Erle, C. J., in his dissenting opinions which have been mentioned. It has been truly said, that his reasoning depends upon an assumed moral right of the railroad companies to such a monopoly as would authorize them "to throw obstacles in the way of other carriers interfering with" it. See L. R. 4 H. L. 244. We have seen that the assumed foundation in monopoly fails. The question then becomes a very simple one of common sense; and indeed, independently of the point of monopoly, seems to be a very plain one of justice. The additional charge, or the refusal of the rebate, is a simple extortion. It forces the unwilling party either to accept the service at each end of the line, or to pay the value of such service twice at each end. Nothing but absolute legal monopoly could authorize the enforcement of such a charge. It seems from the decisions that where no statute applies, no rebate short of the whole value of the charge for horse power can be reasonable. 7 Man. & G. 253, 290; 6 C. B. (N. S.) 639; 16 C. B. (N. S.) 137, affirming 14 C. B. (N. S.) 1, and acc. with 5 C. B. (N. S.) 336, 363. See 1 Best & S. 159; and compare 10 Mees. & W. 399, 420, 421, 424, with 6 El. & Bl. 109, and with 12 Harris [24 Pa. St.] 382. A common carrier can charge no more than a reasonable compensation for the proper service. The charge may, under different circumstances, vary in amount without being therefore necessarily unreasonable. If reasonable, it may, though unequal, be unobjectionable; but, in general, equality is the standard of both reasonableness and impartiality. It may be added that systematic, as distinguished from occasional inequality, never can be reasonable and impartial. L. R. 4 H. L. 239; 5 C. B. (N. S.) 354. Equality, however, means of course relative, as distinguished from simple ratable equality by weight or bulk. Ratable

difference, which is not relative inequality, may consist in proportions of bulk to weight, in the divisibility or indivisibility of masses, or other convenience or inconveniences for packing or transportation or delivery, or may depend upon degrees of liability to undergo, or to cause, injury or deterioration. Other examples might be variously multiplied. The charter of the defendants limits the rates of their tolls, but contains no limitation of the rates which they may charge as carriers. A freighter sued them in equity to prevent them from charging, as carriers, beyond the prescribed limit of the tolls. The bill was dismissed because the limitation did not apply. 4 P. F. Smith [54 Pa. St.] 310. The reason of the decision has already been fully stated and explained. The defendants are not justifiable in founding upon it an argument, which they urge, that they may, as carriers, charge whatever amount reasonable or not, they may please. On the contrary, they claimed in that case only the right of making a reasonable charge; and their answer averred expressly that the charges in question were and always had been "most moderate and reasonable."

The case was finally heard upon bill and answer. As there was no replication, the reasonableness of the actual charges could not be disputed, if the enactments of the charter allowed any excess whatever beyond the prescribed limit of tolls distinctively so called. The case therefore is an authority rather against than in support of the present argument for the defendants. Indeed, if it had been expressly enacted that they might charge what they should think fit, this would mean what they should reasonably think fit. Martin, B., so instructed a jury (11 Exch. 744); and, in banc, though it was not necessary to decide the point, there was a dictum of Alderson, B., to the same effect (Id. 749, 752). This dictum, which was afterwards cited without dissent by Williams, J. (5 C. B. N. S. 117, 118), and with seeming assent by Willes, J. (Id. 120), has the support of a previous decision of like tendency (12 East, 157), and is conformable to a rule of general jurisprudence for the interpretation of such words (Dig 19, 2, 24 pr. 5 Co. 100, Poth. Obl. N. 48; 2 Johns. 395, 401; 4 Serg. & R. 1; Baldw. 388; 4 Bing. N. C. 105; 4 El. & Bl. 256). But the words of the defendants' charter suggest, independently of the argument, no such question. If the charter had contained words limiting the rates of the freight money, or, what would be the same in effect limiting the addition which might be made to the amount of tolls, the defendants could optionally have charged the maximum rate, whether it would otherwise have been reasonable or not. 12 P. F. Smith [62 Pa St.] 228, 229. They might therefore, in that case, have established a tariff of charges equal to, or below, the maximum rates; and might have made such occasional impartial abatement from the tariff or ordinary rate,

as they saw fit. There is no legal necessity that such abatement should be absolutely uniform if the occasional deviation is impartial. But if the deduction is disproportional to any exigency which may have caused it, this will be strong evidence that it is neither reasonable nor impartial. The two last sentences repeat what had been previously said. Arbitrary discrimination is of course illegal; and so is discrimination for the advantage or disadvantage of one person, or of a select few. There can be no abatement for the advantage direct or indirect of the company itself, or of its managers or officers or agents or servants or friends. The language of the supreme court of the state (12 Harris [24 Pa. St.] 381–383; 11 Wright [47 Pa. St.] 340, 341; 12 P. F. Smith [62 Pa. St.] 230) is in this respect conformable to what has been repeatedly decided as to railroad companies in France and in England, and is generally recognized as law throughout the United States.

The defendants, however, contend that English decisions upon the subject are not of authority here, because English statutes prescribe not simple reasonableness in the charges, but equality, which, it is argued, means ratable or arithmetical, as distinguished from relative equality, except where it is otherwise positively enacted. This view has not been taken by the supreme court of the state; nor is it correct. In one of the cases last cited, that court said that those English statutes are but declaratory of what the common law is. 11 Wright [47 Pa. St.] 340, 341. This observation is practically and almost literally correct. The English enactments, where they give a latitudinary option as to rates of charge within a prescribed maximum, provide that such charges must be made equally to all persons in respect of like things under like circumstances. The requirement of like things and like circumstances, if omitted, would be implied. This was the meaning of the supreme court. The English statutory requirement thus imports relative equality, not simple ratable equality. English courts have so understood and applied the enactments. Moreover, in many of those English cases whose authority the argument would impugn, the question of reasonableness was discussed; and in some of them it was decided, as distinct from that of simple equality. English statutes, in allowing the great latitude of charges, have, however, in favor of railroad companies, altered, in some degree, the rule of the common law, which required the charge of a common carrier to be always reasonable. In the compensating requirement of equality, English statutes have, in some degree, substituted a legal criterion of rightfulness of the charge for what was, at common law, only evidence or part of the evidence for a jury on the question of reasonableness. In an action at law inequality in charges had thus previously been evidence of unreasonableness,

the effect of the evidence being determinable by the verdict. See L. R. 4 H. L. 237, 239. In Pennsylvania, the question is wholly for the jury, except so far as the rules of the common law may be qualified by a statutory limit, or prescribed maximum, of the charge. It may be observed that a court of equity, where the question, whatever may be its form, is in the least doubtful, awaits the decision of it by a court of law. 1 H. L. Cas. 35; 3 Eng. Ry. Cas. 561. In English decisions, if we consider the importance of the questions, and the earnestness of the contentions, it will appear that, instead of the contrariety of opinions imputed in the argument, there has been a general uniformity. The questions, however, elaborated, have indeed, perhaps, been more important than difficult. If they were considered anew, independently of the authorities, the decisions would certainly, on original principles, be the same.

We have now reached the first of the two questions in the present case. It is whether to grant an interlocutory injunction restraining the defendants from including any rate for the use of the horse power in their charge to the plaintiffs, who do not use it, or from otherwise making the extortionate overcharge. If the complainants, in the simple relation of one of the public, had, submitting to all just and proper regulations of the defendants for the promotion of the public interest, and the administration of their own franchises, asked only protection by such an injunction in the lawful business of competing carriers, it is possible that they might have had such relief before obtaining a judgment at law, or perhaps even interlocutorily, through this would be contrary to the ordinary course of equitable procedure. 1 H. L. Cas. 35. To justify such a departure from the ordinary course, the legal right in aid of which the injunction is asked, must, however, be quite free from doubt. It is not necessary to decide whether this would have been such a case. The complainants have not so proceeded as to enable them to ask interlocutory relief under this head. If they "ask equity, they must do equity," or in good faith aver a readiness to do it. This they have not done, either in or, so far as appears, outside of their bill. Possibly this may not insurmountably impede them at the final hearing, when a decree may be so framed as to adjudge against them the questions upon which their positions are untenable. But these questions cannot be now so decided. To leave them open, and at the same time place the complainants interlocutorily on the footing of a successful litigant, would be uneven justice.

The same reasons precisely do not apply to the remaining question. It is that of the packed parcels. What is called in England the packing of parcels, and in France groupage a couvert, must be distinguished from the case of loose or unpacked parcels, grou-

page a decouvert. Neither designation should be understood as applicable to articles of such description as, for purposes of transportation, as meal, grain, coffee, sugar, etc., when sent in large aggregate quantities, are usually made up of several bags or parcels. The case of unpacked parcels occurs where articles or parcels, which might be united as a single package, are consigned by, or to, the same person. In such a case, where no legislation applies, the railroad company, as carrier, has a right to charge for every package or parcel, as a several subject of transportation. 6 El. & Bl. 77. It seems that in Europe the right has been very often waived, and a single charge for the whole has been made by weight, as if they had composed a single package. Occasional acts of such liberality, causing accidental inequality in charges, do not impair the right of making the charges separately in other instances. 1 Best & S. 154. But if it is dispensed with systematically to persons in any kind of business, the dispensation must be extended alike to all without any discrimination against a middleman who sends the unpacked parcels consigned to himself or to his own agent. 7 Man. & G. 291, 292. But the company may fairly discriminate between such a case and one in which, though the consignor is the same person, the parcels are distributable among several persons at the end of the line. 4 C. B. (N. S.) 63; 1 Best & S. 165, 166. The decisions of some of the questions in some minute particulars, have been somewhat affected by British legislation. Compare 7 Man. & G. with 1 Best & S. The case of packed parcels, before railroads were known, occurred thus: A middleman representing as a carrier, one or more transmitters of numerous articles or parcels to several destinees, whom he also represented, inclosed or packed the articles or parcels together so that they composed a single item for transportation by a principal carrier who knew only the middleman and his agents. The parcels thus packed were charged as for a single package, if it was of convenient bulk and weight. When the principal carrier is a railroad company, the middleman carries the package by his own horse power to the depot, station, or office of reception, consigning it from thence, in his own name, to himself or his own agent at the place of destination, where he receives it at the railway depot, station, or office of delivery, and carries it by his own horse power to the respective destinees. The rates for carriage by rail are such as enable the middleman so to adjust the bulk and weight of the package to the tariffs of charges that the profit of the railroad company is much smaller than if the parcel intended for every destinee had been a separate small package. This detriment, though perhaps a hardship to the carrier by rail, was no reason that he should object to receiving and carrying the packed parcels, unless the package in mass was of inconvenient bulk or weight for the intended transportation. Yet where no such inconvenience could be suggested, English railroad companies formerly refused, as the defendants now refuse, to receive such package unless upon payment of the aggregate sum which would have been chargeable for the carriage of several parcels if each of them had been a separate package. An English judge of distinguished eminence, Willes, J., said that it was some time before he could understand that such a question could be seriously argued. 5 C. B. (N. S.) 119. The argument was made intelligible only by dividing the question.

As it was divided, the points were: First, whether the aggregate charge of the full sum of the rates for several packages could be sustained; secondly, whether the carriers by rail could make a small addition to the charge as for a single package, in order to cover the risk of contingent liability to actions at the suit of unknown transmitters, destinees, or owners of the several parcels or articles inclosed. The reasoning on the first point against the railroad companies was unanswerable. Since the decision in 10 Mees. & W. 399, the contention has in England been principally upon the second point. In the present case, the argument has been upon the second point, with however, an unwarrantable assumption of a conclusion upon the first. as if it were consequential. In England, juries "have often negatived, that in point of fact, carriage" of the packed parcels "for collecting carriers imposes greater risk or expense upon the railroad company" than would be incurred if they were not packed. L. R. 4 H. L. 247; 11 Exch. 758, 759; 5 C. B. (N. S.) 112, 113. The courts, approving the verdicts, have decided that "such carriers are entitled to have their packed parcels carried upon the railway for the same price as other persons." As to risk of loss from carelessness or from pilfering, there may be less risk than if the parcels were separate. The question was also put to juries in England, "in respect of supposed liability" of the railroad company, as the principal carrier, "to several actions" at the suit of unknown parties owning the goods. On this point, it has been said that there has not, in England, been a single instance of such a suit; and the language of English judges might seem to import even a doubt whether the suit would be maintainable. This part of the question is differently considered in the United States. There is no doubt, either on principle or on authority, that several actions, at the suit of the respective owners, are maintainable ([New Jersey Steam Nav. Co. v. Merchants' Bank] 6 How. [47 U. S.] 380, 381; 6 Bin. 129; 2 Redf. Ry. § 169 [4th Ed.] p. 18); and actions at their suit are brought much oftener against the railroad companies than against the middlemen. If the principal carrier is regarded only as an agent, he may be sued by the

unknown party interested. If the public employment as carrier is alone considered, immediate privity of contract is not essential to the right of action against him for an injury suffered through his default. The question was moreover, under the English carriers' act of 1830, very different from what it was in the United States. An English act of 1854 has nearly restored the English law in this respect to what it had been before 1830. The difference was that in the intervening period, an English railroad company, as a common carrier could exempt itself from liability even for culpable negligence by making its engagement conditional. The irrational state of English law on the subject in that interval, and the difference now in question; were fully explained in a case in the house of lords in 1863. 10 H. L. Cas. 493, 495. It is, however, to be noted that one of the English verdicts, judicially approved, on the question of the risk of suits, was after the new act of 1854. 5 C. B. (N. S.) 112, 113. The question left thus to English juries was in great part matter of law. But matter of fact is involved in it; and here, as in England, the law on the question of packed parcels must be administered through verdicts of juries. An English railroad company was legislatively authorized to make an additional charge for carrying packed parcels, and established an additional rate accordingly; but did not charge the addition to wholesale dealers who transmitted such parcels. Middlemen who were carriers, being compelled to pay the additional rate, sustained an action to make the railroad company refund it. The proof convinced the jury that the exemption of the wholesale dealers was preferential and habitual. 3 Hurl. & C. 809, 849, affirmed L. R. 4 H. L. 226.

The defendants take the untenable extreme position that they can make the full charges as for separate packages. On this point, of course, the charge cannot be maintained. But the inquiry still open is whether a small addition to the charge for the package in mass may not be allowable to cover the risk of contingent liability to several actions. This increases the difficulty of the complainants' case on the question of granting an injunction. In such a case in England, the court in chancery refused to grant an injunction until the right should be determined at law. 3 Eng. Ry. Cas. 538. But the decision was mainly on the ground of the complainants' delay. The case already cited in 1 H. L. Cas. 35, is to the effect that, if the pecuniary excess of the charge was ascertained, an injunction would be proper after a judgment at law. But the case in L. R. 1 Exch. 32, under the auxiliary equitable jurisdiction conferred by the English common law procedure act of 1854, indicates doubt whether, on the question of packed parcels, the uncertainty in the amount would not, even after a judgment at law, prevent the application of the rule of the former decision. The distinction is, perhaps, overnice, and the doubt may not be well founded. But here no judgment at law has been obtained; and there is an open part of the question of right which seems to be determinable at law only. To meet the exigency of questions with railroad companies, whether as to their withholding reasonable facilities, or subjecting to undue or unreasonable prejudice or disadvantage, or as to the giving of any undue or unreasonable preference or advantage, a summary jurisdiction has been conferred in England upon the court of common pleas by a statute (17 and 18 Vict. c. 31, §§ 3–6). But no other English court of law has any such jurisdiction; nor has the English court of chancery. If the creation of such a summary jurisdiction here is expedient, it should not be vested in courts of the general government. On the continent of Europe the questions are judicially cognizable only for the enforcement of legislative and executive regulations. The decision of questions like the present is, under most European governments, by an executive department and summary. The proportions of the subject are certainly enlarged here beyond the usual measure of judicial administration. But the experiment of an executive board of railroad commissioners, where tried, seems to have failed of success.

All that can be done at present is to refuse the interlocutory injunction, giving to the complainants leave to proceed at law, during the pendency of the proceedings in equity, if they shall be so advised. Thus far, it has been assumed that the suit is by a competent party. The Adams Express Company is an association organized under Laws of New York of 1849 (chapter 258) and 1854 (chapter 245), which confer certain powers and privileges possessed only by corporations; and enact that the association may sue in the name of their president. But the latter act provides that nothing contained in it shall be construed to give them any rights and privileges as corporations. Notwithstanding this enactment. an association of this kind is considered even in New York a corporation for certain purposes. 15 How. Pr. 172. That it may extraterritorially be so considered for such purposes appears from a comparison of the case in 100 Mass. 531, affirmed in [Liverpool Ins. Co. v. Massachusetts] 10 Wall. [77 U. S.] 567, with [Bank of Augusta v. Earle] 13 Pet. [38 U. S.] 586, 591. It does not necessarily follow that such a joint stock company can sue in this court as a citizen of New York under the authority of the series of decisions beginning with [Louisville, C. & C. R. Co. v. Letson] 2 How. [43 U. S.] 497, which sustains such suits by corporate bodies of the ordinary kind. If the latter decisions apply, it is possible that, through comity, the express company may be allowed a capacity to sue at law in the name of their president. extraterritorially as well as in the state of New York. Compare the

Chamberlain of London's Case, 5 Cope, 62b, 63b, with 10 Wall. [77 U. S.] 567, and 13 Pet. [38 U. S.] 586, 591 [supra]. But even in that case it might in a suit in equity be necessary to unite the express company as complainant. As this omission is of course amendable, the case may, in its present stage, be considered as if that company were already complainants of record. But whether the amendment be made or not, the question of jurisdiction will be contestable. It cannot be decided without further argument than has been heard by the court. Under the stockholders' bill there is very little to be added. If the foregoing views are correct, the controversy, properly described, is not whether the defendants have usurped a franchise, but whether their franchises are administered rightly in special respects. Independently, therefore, of the reasons of a more general kind stated and explained by the circuit judge, the two questions of overcharging to which the numerous points of argument have been reduced, if cognizable under this bill, cannot be considered until the final hearing.

[NOTE. For disposition on demurrer of a subsequent suit by complainant Dinsmore against the same defendant, see Dinsmore v. Philadelphia & R. R. Co., Case No. 3,921.]